# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZUMA PRESS, INC., ACTION SPORTS PHOTOGRAPHY, INC., TIYU (BEIJING) CULTURE MEDIA CO. LTD., MANNY FLORES, ANDREW DIEB, CHRISTOPHER SZAGOLA, LOUIS LOPEZ, CHARLES BAUS, DUNCAN WILLIAMS, ROBERT BACKMAN, JOHN MIDDLEBROOK, and ANTHONY BARHAM, | Case No.: 1:16-cv-06110 (AKH) |

Plaintiffs,

v.

GETTY IMAGES (US), INC.

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**<u>TABLE OF CONTENTS</u>**

Page

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL HISTORY.....................................................................................7

STATEMENT OF UNDISPUTED FACTS .............................................................10

    The Parties ......................................................................................................10

    How Getty Images Came To Possess the Photographs .....................................11

        A.    Zuma Submitted Sports Photographs to Corbis Under NewSport's Contract To Take Advantage of NewSport's Higher Royalty Rate .........11

        B.    All Images Submitted by Zuma Under NewSport's Contract with Corbis Remained Part of the NewSport Collection ...................................14

        C.    The Sale of Corbis' Image Licensing Business to VCG and Getty Images' Agreement with VCG To Distribute Corbis Content for VCG Outside of China..............................................................................17

        D.    The Migration of the NewSport Collection From Corbis to Getty Images, as Expressly Authorized by Both VCG and NewSport...............18

        E.    Zuma's Initial Email Alleging Unauthorized Use, Getty Images' Removal of Migrated Images Containing References to Zuma in the Metadata, and Getty Images' Subsequent Investigation of Zuma's Claims .........................................................................................20

    The Alleged Alteration of Copyright Management Information......................................25

        A.    The Appearance of a "Double Byline" ......................................................25

        B.    The Automated Replacement of Unrecognized Characters With Question Marks...........................................................................................28

        C.    The Getty Images Watermark ....................................................................29

ARGUMENT ...........................................................................................................30

    I.    THE SUMMARY JUDGMENT STANDARD....................................................30

    II.    GETTY IMAGES' USE OF PLAINTIFFS' PHOTOS WAS AUTHORIZED, AND PLAINTIFFS ARE ESTOPPED FROM CONTENDING OTHERWISE ..............................................................................30

i

      A.      Getty Images' Use of the Photographs Was Authorized .......................... 31

      B.      Plaintiffs Are Equitably Estopped From Arguing That Getty Images' Use Was Not Authorized ............................................................ 32

III.    PLAINTIFFS HAVE NO STANDING TO SUE FOR INFRINGEMENT OF MORE THAN 12,000 OF THE PHOTOGRAPHS THEY ATTEMPTED TO PLACE AT ISSUE .................................................... 36

IV.    GETTY IMAGES DID NOT VIOLATE SECTION 1202 .................................. 37

      A.      There Was No Knowing Falsification, Alteration, or Removal of CMI ........................................................................................................ 39

      B.      There Was No Effort to Induce, Enable, Facilitate, or Conceal Infringement ............................................................................................ 41

CONCLUSION .......................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................30

*Banxcorp v. Costco Wholesale Corp.*,
  723 F. Supp. 2d 596 (S.D.N.Y. 2010).......................................................................38

*Bryant v. Europadisk, Ltd.*,
  No. 07 Civ. 3050 (WGY), 2009 WL 1059777 (S.D.N.Y. 2009), *aff'd sub. nom.*,
  *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135 (2d Cir. 2010) ...........................41

*Chevrestt v. Am. Media, Inc.*,
  204 F. Supp. 3d 629, 632 (S.D.N.Y. 2016)...............................................................38

*Davis v. Blige*,
  505 F.3d 90 (2d Cir. 2007)....................................................................................31, 36

*DeCarlo v. Archie Comic Publ'ns, Inc.*,
  127 F. Supp. 2d 497 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir. 2001)....................33

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)..................................................................................................30

*Field v. Google, Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) .......................................................................33

*Grateful Dead Prods., Inc. v. Auditory Odyssey*,
  76 F.3d 386 (9th Cir. 1996) (unpub.).........................................................................43

*Hadady Corp. v. Dean Witter Reynolds, Inc.*,
  739 F. Supp. 1392 (C.D. Cal. 1990) ..........................................................................35

*Heckler v. Cmty. Health Servs.*,
  467 U.S. 51 (1984), *aff'd*, 584 F. App'x 2 (D.C. Cir. 2015) ....................................32

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
  413 F.3d 257 (2d Cir. 2005).......................................................................................42

*John Wiley & Sons, Inc. v. DRK Photo*,
  998 F. Supp. 2d 262 (S.D.N.Y. 2014), *aff'd*, 882 F.3d 394 (2d Cir. 2018) .............36

*Keane Dealer Servs., Inc. v. Harts*,
  968 F. Supp. 944 (S.D.N.Y. 1997)..................................................................33, 34, 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..........................................................................................30

*Psihoyos v. John Wiley & Sons, Inc.*,
    No. 11 Civ. 1416 (JPO), 2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012),
    *aff'd*, 748 F.3d 120 (2d Cir. 2014)..................................................................43

*Radio Sys. Corp. v. Lalor*,
    709 F.3d 1124 (Fed. Cir. 2013).......................................................................34

*Reilly v. Plot Commerce*,
    No. 15-CV-05118 (PAE) (BCM), 2016 WL 6837895 (S.D.N.Y. Oct. 31, 2016).................38

*Slate v. Am. Broad. Co.*,
    941 F. Supp. 2d 27 (D.D.C. 2013)............................................................32, 35

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015).....................................................31, 32

*Stevens v. CoreLogic, Inc.*,
    No. 16-56089, 2018 WL 3040129 (9th Cir. June 20, 2018)............................38, 44

*United States Naval Inst. v. Charter Communic'ns, Inc.*,
    936 F.2d 692 (2d Cir. 1991)............................................................................31

*Waran v. Christies, Inc.*,
    No 16-cv-1386, 2018 WL 2452758 (S.D.N.Y. May 31, 2018)..............................43

*Watermark Publishers v. High Tech. Sys. Inc.*,
    No. 95-3839-IEG (CGA), 1997 WL 717677 (S.D. Cal. June 18, 1997)..................33

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996)..............................................................................30

**Statutes**

17 U.S.C. § 101..............................................................................................36

17 U.S.C. § 501...........................................................................................8, 36

17 U.S.C. § 1202, *et seq.* ........................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 56(a) ......................................................................................30

Fed. R. Civ. P. 56(e)(2)..................................................................................31

Defendant Getty Images (US), Inc. ("Getty Images") submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1.

## PRELIMINARY STATEMENT

As Getty Images previously advised the Court (*see* Dkt. 47), this copyright infringement case is a meritless effort by lead plaintiff Zuma Press, Inc. ("Zuma") to hold Getty Images liable for the consequences of Zuma's own conduct.  Subsequent discovery has only buttressed that conclusion.  Zuma claims that Getty Images: (i) "stole" more than 47,000 of its images in order to offer them for licensing on its website; and (ii) intentionally altered attribution information embedded in the images' metadata in violation of section 1202 of the Copyright Act.  But the undisputed record evidence shows otherwise.  It demonstrates that Zuma intentionally co-mingled its images with those of another photographic licensing agency, NewSport Photography, Inc. ("NewSport"), and expressly represented that NewSport controlled the rights to those images in an effort to game the system and extract a higher royalty rate from NewSport's and Zuma's authorized distributor, Corbis Corporation ("Corbis").  As a direct consequence of Zuma's actions and a subsequent license transaction between NewSport and Getty Images for NewSport's entire collection, Getty Images lawfully came to possess the rights to display and license the images Zuma now claims were "stolen."  This series of events is fatal to Plaintiffs' claims.

More specifically, undisputed facts show:

- In 2010, Zuma entered into a "Representation Agreement" with Corbis, a large image-licensing business.  Pursuant to that agreement, Corbis received the rights to license and distribute Zuma's photographs to third parties in exchange for royalties.

- In 2011, Zuma became aware that NewSport had a similar relationship with Corbis but with a more favorable royalty rate.

- In September 2011, Zuma hired the President of NewSport, Les Walker.  Zuma and Walker agreed that Zuma would submit Zuma's sports-related photographs to Corbis through NewSport's file transmission protocols ("FTP") and pursuant to NewSport's contract instead of its own.  In other words, Zuma and Walker agreed that Zuma would submit its content to Corbis *as NewSport content* in order to take advantage of NewSport's more favorable royalty rate.

- Zuma and NewSport memorialized this arrangement as part of an agreement with Corbis for redirection of royalty payments (the "Redirection Agreement").  In that agreement, which was signed by Walker for NewSport and by Scott Mc Kiernan, the CEO of Zuma, the companies expressly affirmed that NewSport was the authorized licensor of all of the photographs submitted under its contract, meaning that all images became a part of the NewSport collection, whether they originated from Zuma photographers or NewSport photographers.  Zuma accepted these terms in order to increase the royalty rate it could earn on sports photographs.

- In 2012, Corbis renegotiated its agreement with NewSport, and NewSport ceased to have a more favorable royalty rate than Zuma.  As a result, Zuma stopped using NewSport's FTP credentials to deliver photographs to Corbis and resumed using a separate feed that was tied to its own contract, rather than to the NewSport contract.

- By the beginning of 2013, the relationship between Walker and Zuma had soured beyond repair, and on January 9, 2013, Walker terminated his employment with Zuma.

- After Walker informed Zuma of his decision to terminate his employment, Zuma attempted to persuade Corbis to remove the photographs that Zuma had intentionally added to the NewSport collection pursuant to the Redirection Agreement.

- Because the photographs at issue had been submitted to Corbis pursuant to an express representation that NewSport—not Zuma—was the authorized licensor of those images, Corbis informed Zuma that it could not remove those photographs from the archive associated with NewSport without NewSport's written consent.

- Such written consent was never provided, and Zuma acquiesced for years as Corbis continued to display and offer those photographs as part of the NewSport collection.

In January 2016, Corbis sold its photographic licensing assets to Unity Glory

International Limited, an affiliate of a Chinese image licensor known as VCG (collectively,

"VCG"), and VCG entered into a distribution agreement with Getty Images to distribute and

market, *inter alia*, photographic content acquired from Corbis outside of China, including in the

United States.  At the time Corbis exited the image licensing business, each of the photographs

alleged to be at issue in this case remained associated in Corbis' records with the NewSport contract, pursuant to the Redirection Agreement and Zuma's submission of photographs to Corbis under NewSport's contract.

Getty Images did not simply ingest every photograph previously distributed through Corbis. Rather, it engaged in a rigorous process by which it evaluated the content, determined which collections it wished to represent on its site, and then approached those contributors to determine if there was mutual interest. If so, Getty Images attempted to sign those contributors to direct contributor agreements with the rightsholder or authorized representative for each collection so that those relationships would be governed by the same terms as Getty Images' other contributors. If there was not mutual interest, Getty Images did not migrate the content.

As part of this process, in April 2016, Getty Images entered into a contributor agreement with NewSport. That agreement, like Getty Images' other contributor agreements, contained representations and warranties as to NewSport's rights to license the photographs subject to the agreement and NewSport's authority to enter into the agreement. Following execution of that agreement—and unaware of Zuma's prior submission of photos to Corbis under the NewSport contract—Getty Images migrated the NewSport collection to its own system as part of the overall ingestion of some seven million photographic assets previously distributed by Corbis. In the course of that necessarily automated process, the NewSport images were treated the same as all other Corbis images selected for migration and in accordance with the terms of Getty Images' standard contributor agreement.

In May 2016, Zuma discovered what it claimed were Zuma photos on the Getty Images website. In August 2016, and notwithstanding its knowledge that the photographs at issue were part of the NewSport collection previously available through Corbis, Zuma filed this lawsuit.

There was no violation of Plaintiffs' rights by Getty Images, let alone any intentional or reckless violation, in any of the foregoing.  Getty Images was authorized to ingest and license each of the 47,048 photographs at issue (the "Photographs") because each of them was added by Zuma to the NewSport collection.   As a result, NewSport, not Zuma, was identified as the source in the metadata provided by Corbis for all 47,048 photographs.  Getty Images had no way of knowing that Zuma had submitted photographs to Corbis for inclusion in the NewSport collection.  None of the parties that *did* know—Zuma, Corbis, and NewSport—ever disclosed that fact to Getty Images either prior to or during the migration.  It was a complete surprise to Getty Images when Zuma first notified it in May 2016 of its contention that Zuma photos were on the Getty Images website without its permission and that NewSport had never been authorized to distribute the Photographs (which we now know to be false).

Given these undisputed facts, Zuma is reduced to arguing that Getty Images somehow acted in bad faith after receiving Zuma's complaint in May 2016. That too is refuted by the record, which shows unequivocally that Getty Images responded immediately to Zuma's complaint by searching for, identifying, and removing (as a precaution) 26,000 images with a reference to Zuma in the metadata—all by the following day.  Getty Images also mobilized an urgent investigation into Zuma's claim to try to understand whether (and, if so, how) the Photographs could have been mixed into the NewSport collection without Zuma's authorization. These were hardly the actions of an intentional infringer.

The contrast between Zuma's deceptive silence and Getty Images' diligent candor has marked this dispute from the beginning.  Before the case was filed, as Zuma remained mum about having authorized NewSport to license the Photographs, Getty Images compiled and voluntarily supplied Zuma's counsel with the results of its investigation, including a list of all of

the photos with a reference to Zuma in the metadata on the Getty Images system along with their corresponding Corbis ID numbers, and informed Zuma that each of these photos was associated with NewSport's Corbis contract.  Getty Images further told Zuma's counsel that it had learned that NewSport's principal, Les Walker, had worked for Zuma and had allowed Zuma to submit photos to Corbis using the NewSport FTP credentials so that Zuma could benefit from NewSport's higher royalty rate.  Finally, Getty Images reported the paltry total revenues earned by Getty Images from the images during the brief time they were available on the Getty Images website.[1]  Instead of forthrightly acknowledging its own conduct and working constructively with Getty Images to resolve the matter, Zuma filed this action without warning, using the fruits of Getty Images' research against it and alleging intentional and/or reckless infringement with no factual support for that vaguely pleaded claim—which is now thoroughly refuted by the discovery record.

Having disposed of several of Plaintiffs' claims and limited others in its motion to dismiss ruling, the Court should now grant summary judgment disposing of Plaintiffs' remaining claims, as the undisputed record closes the door definitively on each as a matter of law.

*__First__*, as for the infringement claims, for more than a quarter of the Photographs, Plaintiffs do not even have standing, as none of them produced any evidence that it either owns or holds an exclusive license to them.  As for the rest, Getty Images' use of the Photographs was authorized and thus not infringing.  As summarized above, Zuma's intentional submission of photographs under the NewSport contract and the Redirection Agreement resulted in NewSport having the right to license the images.  After Getty Images acquired licensing rights to Corbis' assets from VCG, Getty Images obtained from NewSport the rights to represent the entire

---

[1] As subsequently corrected, that amount was less than $100.  Declaration of David Wojtczak, dated June 28, 2019 ("Wojtczak Decl."), ¶ 28.

NewSport collection previously available through Corbis, and (as a result of Zuma's own conduct) that collection included the images submitted by Zuma to Corbis under the NewSport contract. There is no dispute that to the extent Zuma attempted to reclaim rights to the images it had submitted to Corbis under the NewSport contract, it needed written and signed permission from NewSport, which NewSport never provided. Thus, all of the Photographs remained part of the NewSport collection in 2016, when that collection was migrated from Corbis to Getty Images with NewSport's express authorization, accompanied by representations and warranties as to NewSport's rights in the images.

*__Second__*, even if there were any question as to Getty Images' right to license the Photographs, Zuma is equitably estopped from arguing that Getty Images' use was unauthorized because Zuma's own conduct—its submission of images to Corbis under the NewSport contract and its failure to have them removed from the NewSport collection—led directly to that use. Because Zuma's own actions and omissions are the cause of any alleged unauthorized use of the Photographs by Getty Images, equity demands that Zuma be estopped from attempting to hold Getty Images liable for infringement.

*__Third__*, there is no legal or factual basis for the section 1202 claims. To have violated section 1202, Getty Images would have had to alter the metadata (copyright management information ("CMI")) both knowingly and with an intent to induce, conceal, enable, or facilitate infringement for each of the 47,048 images at issue. If there is no infringement—and, as explained, there was not—there is no violation of section 1202. Even if there had been infringement, Plaintiffs cannot meet their burden of showing it was done with the requisite intent *and* that it was brought about by any alleged manipulation of the CMI. Nothing of the kind occurred here. Undisputed facts show that the complained-of anomalies in the photo credit lines

of the Photographs as they appeared on the Getty Images website were the unintended result of an automated process that was applied to all images migrated from Corbis pursuant to express grants of permission in the contributor agreements, and the record establishes unequivocally that Getty Images did not seek to induce, conceal, enable, or facilitate infringement.  To the contrary, Getty Images reasonably believed it had acquired all of the necessary rights to the Photographs from an authorized licensor of those images, and every one of the Photographs that appeared on Getty Images' website was published with a caption that named both the photographer and Zuma; there was no concealment of their provenance.  Even if the Court were to find a genuine issue of material fact as to whether Getty Images intentionally infringed—a conclusion for which there is no record support—the section 1202 claims still would fail because the alleged CMI violation did not play any role in the claimed infringement.

For all these reasons, this trumped-up, legally and factually unfounded effort by Zuma to convert its own negligence and duplicity into an unjustified windfall should come to an end. There are no issues of material fact that should prevent this Court from granting Getty Images' motion for summary judgment.

## PROCEDURAL HISTORY

Zuma filed a complaint on August 1, 2016, in which it accused Getty Images of (i) "carelessly and recklessly acquiring content, not doing due diligence and not taking adequate measures to prevent infringement" (Dkt. 1 ¶ 17) and (ii) engaging in "willful, intentional, and purposeful" infringement "in disregard of and indifference to" Zuma's exclusive rights.  *Id.* ¶ 24. The complaint contained no factual support for this rhetorical jumble of conclusory allegations. Zuma was notably vague as to how the claimed infringement occurred, alleging only that "Defendant copied approximately . . . 47,048 Photographs and placed it on their (sic) Website to license and sell to the public."  *Id.* ¶ 18.  Zuma also alleged that it had "exclusive relationships"

with its sports photographers who "do not, as a rule, work with any other agency, licensee, or entity," *id.* ¶ 9, thereby suggesting, without actually alleging, that it had an exclusive license to each of the allegedly infringed photos. Zuma asserted claims for copyright infringement under section 501 of the Copyright Act and for "removal and/or alteration of copyright management information" under section 1202(b). *Id.* ¶ 1. Getty Images moved to dismiss the complaint on the grounds that: (i) Zuma had failed to register any of the copyrights alleged to be at issue and thus failed to satisfy a statutory prerequisite to filing an infringement claim; (ii) Zuma had failed adequately to plead ownership of the copyrights at issue as required to establish standing to pursue infringement claims; and (iii) Zuma's allegations in support of its section 1202(b) claims were no more than conclusory recitals of the elements of the cause of action. Dkt. 16.

Rather than defend the complaint, Zuma filed a First Amended Complaint (Dkt. 21) in which it, *inter alia*, added eleven new plaintiffs (nine photographers and two photo licensing agencies) in an effort to partially address Getty Images' challenge to Zuma's standing. In addition to re-asserting copyright infringement and section 1202(b) claims, Zuma added a claim for contributory infringement as well as new claims arising under the Lanham Act, state unfair competition law, and section 349 of the New York General Business Law. Like the original complaint, the First Amended Complaint contained no factual allegations as to how Getty Images had acquired the Photographs and was notably silent as to Zuma's own causal role in that chain of events. Plaintiffs merely alleged that on or around May 4, 2016, Zuma "searched for ZUMA PRESS in the search bar of the Getty Website and found the Photographs on the Getty Website," Dkt. 21 ¶ 57, and that Getty Images "improperly copied at least [47,048] Sports Photographs." *Id.* ¶ 56. Despite already having conceded (by adding additional plaintiffs) that it did not, in fact, have exclusive rights to all of the works at issue, Zuma repeated its false

allegation that it had "a significant copyright ownership interest in the copyrighted works that are the subjects of this litigation." *Id.* ¶ 28.

Getty Images moved to dismiss the First Amended Complaint.  Dkt. 26.  On June 29, 2017, the Court issued an opinion dismissing the contributory infringement, Lanham Act, unfair competition, and section 349 claims in their entirety and dismissing the copyright infringement claims as to works that had not been registered by August 1, 2016 (the original filing date).  Dkt. 33.  The Court also held that Plaintiffs "may not pursue claims with respect to photographs other than the 47,048 photographs identified on Getty's website." *Id.* at 6.  With respect to standing, the Court referenced the small sample of exclusive licensing agreements attached to the complaint and stated that if "after discovery, it turns out that Zuma does not have an exclusive agreement with respect to a particular photograph, Getty may move for summary judgment with respect to that photograph." *Id.* at 7.

The dismissal of the infringement claims as to works not registered prior to August 1, 2016 effectively mooted Plaintiffs' infringement claims, as none of the copyrights had been registered by that date.  Thus, on July 28, 2017, Plaintiffs filed a Second Amended Complaint in which they asserted only a single cause of action for violation of 17 U.S.C. § 1202(b).  Dkt. 36.  On August 1, 2017, in light of the Court's order limiting the infringement claims to works registered as of August 1, 2016, Plaintiffs filed a separate complaint in a new action, No. 1:17-cv-05832, asserting a cause of action for copyright infringement of subsequently registered works and duplicative claims for violation of section 1202.

On September 1, 2017, photographer John Pyle moved to intervene in the new action on the ground that Plaintiffs purported to include infringement claims related to "at least 710 photographs" created and owned by Pyle as to which Zuma had falsely claimed exclusive rights.

9

*See* Mem. of Law in Supp. of John Pyle's Mot. To Intervene at 1, Case No. 1:17-cv-05832-AKH (S.D.N.Y. Sept. 1, 2017), Dkt. 13.  The Court denied Pyle's motion after Plaintiffs conceded they had no rights to any of Pyle's photographs.  Case No. 1:17-cv-05832-AKH, Dkt. 20.

On September 6, 2017, the Court consolidated the two cases under the original case number, 16-cv-6110.  Dkt. 40.

On February 6, 2018, Plaintiffs moved to amend the complaint again in order to add twenty-seven new photographer plaintiffs based on the demonstrably false premise that without fact discovery from Getty Images, Plaintiffs had been unable to identify the photographers of many of the Photographs.  Dkts. 45, 46; *see also* Dkt. 47.  The Court denied the motion, noting that it had already allowed the addition of eleven new plaintiffs despite the plaintiff's "opaque" pleading.  Dkt. 60.  The Court observed that the proposed Third Amended Complaint was "no better," as it "lack[ed] specificity showing the precise facts, as to each infringing photograph, of copyright registration, ownership and specific license agreement appointing Zuma as exclusive licensee."  *Id.*  "What may pass at the inception is one thing," the Court stated, but at that stage of the case, there was "no good reason to enlarge discovery and expense."  *Id.*  The fact that none of the facts recited by Getty Images in its brief opposing leave to amend were included in the proposed Third Amended Complaint, which remained deliberately opaque as to Zuma's directly causal role and the fact that NewSport was an authorized licensor of the Photographs, indicates the fundamentally deceptive nature of this litigation.

## STATEMENT OF UNDISPUTED FACTS

### The Parties

Defendant Getty Images is a leading provider of digital media worldwide, creating and offering a range of products from stock photography and editorial images to footage, music and multimedia.  Getty Images serves creative, commercial, and media customers in more than 200

countries, and its imagery helps customers produce work that appears every day in the world's leading newspapers, magazines, advertising campaigns, films, television programs, books, and websites.  Declaration of Travis Lindquist, dated June 29, 2018 ("Lindquist Decl."), ¶ 3.

Plaintiff Zuma is a press agency specializing in photography.  Deposition of Scott Mc Kiernan ("Mc Kiernan Dep.") (Bloom Decl. Ex. C) 11:15-18.[2]  Zuma gathers news—the bulk of it in the form of photographic images—and licenses it to the media.  *Id.* at 11:19-22, 13:16-18. Zuma represents photographers who cover all aspects of news, including entertainment and sports.  *Id.* at 13:2-8.  Unlike Getty Images, Zuma is solely an editorial agency; it does not compete with Getty Images to license images for advertising and similar commercial purposes. *Id.* at 13:16-14:18, 15:4-9.  The other plaintiffs are nine individual photographers and two photo licensing agencies who licensed photographs either directly or indirectly (through another agency) to Zuma on a non-exclusive basis.  Dkt. 36 ¶¶ 10-20.

**How Getty Images Came To Possess the Photographs**

Plaintiffs' intentionally misleading pleadings have masked a sequence of events underlying the claimed infringement that leads right back to Zuma and demonstrates that Getty Images has all along had rights to distribute and license the 47,048 images at issue.

**A.      Zuma Submitted Sports Photographs to Corbis Under NewSport's Contract To Take Advantage of NewSport's Higher Royalty Rate**

Les Walker worked for Zuma as an Assignment Director from September 26, 2011 to January 9, 2013.  *See, e.g.*, Bloom Decl., Exs. FF, Z; Declaration of Les Walker, dated April 23, 2018 ("Walker Decl.") ¶¶ 14, 28.  He was responsible for obtaining credentials for Zuma-affiliated photographers to access and cover sporting events.  Mc Kiernan Dep. (Bloom Decl. Ex. C) 57:25-58:24.  Prior to, during, and after his time with Zuma, Walker was also the President of

---

[2] "Bloom Decl." refers to the Declaration of Jonathan Bloom, dated June 29, 2018.

NewSport, a photographic licensing agency specializing in sports photography.  Walker Decl. ¶ 2; Deposition of Leslie Allen Walker ("Walker Dep.") (Bloom Decl. Ex. E) 9:17-11:3. NewSport had an Image Representation Agreement with Corbis under which Corbis served as the exclusive licensor of images submitted under that contract.  *See* Bloom Decl. Exs. F, G (together, the "NewSport Contract"); Walker Decl. ¶ 9.  The NewSport Contract entitled NewSport to receive 50 percent of all "Limited Rights" royalties earned on submitted images—a royalty split superior, at the time, to that of Zuma, whose own contract with Corbis entitled it to receive only 40 percent of the "Limited Rights" royalties earned on images it submitted.  *See* Bloom Decl. Ex. N at GETT00047857; Walker Decl. ¶ 15.  The higher NewSport rate was attributable to the fact that it had what Corbis considered a "premium offering" consisting of the work of famous Sports Illustrated photographers.  Walker Dep. (Bloom Decl. Ex. E) 17:13-18:3; Deposition of Seth Greenberg ("Greenberg Dep.") (Bloom Decl. Ex. A) 36:16-22.

After hiring Les Walker, Zuma took advantage of its new relationship with NewSport by submitting its photographs to Corbis under the terms of the NewSport Contract in order to benefit from NewSport's more favorable royalty split.  Walker Decl. ¶ 15; Walker Dep. (Bloom Decl. Ex. E) 18:15-19:6 ("this allowed Scott and ZUMA to make 10 percent more on their sports imaging by using me"); Mc Kiernan Dep. (Bloom Decl. Ex. C) 68:20-69:9 ("As stated our contract gave us 40 percent return . . . . So yes we received and wanted to make 50 percent instead of 40 percent."); Bloom Decl. Ex. TT at GETT00047178 ("CORBIS and I had a better agreement for sales percentage then [sic] ZUMA did, so we feed [sic] some of their images through my feed.").  On October 3, 2011, Walker shared with Scott Mc Kiernan, Zuma's CEO, and Ruaridh Stewart, Zuma's News Director, a file transfer protocol ("FTP") path (linked to NewSport Contract #9995), username, and password to allow Zuma to "feed Corbis through

NewSports [sic] deal," and Zuma began submitting its sports photos to Corbis as NewSport photos the very next day.  Bloom Decl. Ex. X; Bloom Decl. Ex. HH at ZUM00353 ("We started feeding sport to Corbis on **Oct 4, 2011**") (emphasis in original); *see also* Deposition of Ruaridh Ingles Stewart ("Stewart Dep.") (Bloom Decl. Ex. D) 35:3-18; Mc Kiernan Dep. (Bloom Decl. Ex. C) 72:6-10, 72:17-73:2; Walker Dep. (Bloom Decl. Ex. E) 20:5-21:2.  The Zuma photographs submitted to Corbis in this manner—which Plaintiffs have conceded include all of the Photographs, *see* May 31, 2018 Letter from Benjamin E. Marks to Richard Liebowitz (Bloom Decl. Ex. YY)—became part of the NewSport collection on Corbis and were distributed as such by Corbis.  Greenberg Dep. (Bloom Decl. Ex. A) 56:9-14.  They appeared on the Corbis website with NewSport identified as the source.  *Id.* 54:18-55:21.

On November 3, 2011, Zuma and NewSport submitted to Corbis a joint Request for Redirection of Royalty Payments, signed by both Walker and Mc Kiernan (the "Redirection Agreement").  Bloom Decl. Ex. Y; Mc Kiernan Dep. (Bloom Decl. Ex. C) 88:14-89:17.  The Redirection Agreement instructed Corbis to direct "all royalty payments due under the [NewSport Contract #9995 & 10944]" to Zuma, noting that it was only a redirection of royalty payments and "*not* an assignment of the Contract."  Bloom Decl. Ex. Y (emphasis in original). More importantly, the Redirection Agreement stated that "all images produced under the Contract shall be personally created by NewSport, or that NewSport *has the authority to grant all rights and licenses under the Contract*."  *Id*. (emphasis added).   The Redirection Agreement was designed to satisfy Corbis' insistence on written confirmation that NewSport had the authority to grant all rights and licenses under the NewSport Contract for all images submitted to Corbis under that contract.  Walker Dep. (Bloom Decl. Ex. E) 24:9-25:1.

By submitting its photographs under the NewSport Contract in order to take advantage of the higher royalty rate, Zuma accepted the assignment of rights to NewSport that attached to the photographs under the Redirection Agreement. Bloom Decl. Ex. Y; Walker Decl. ¶ 19. The NewSport Contract contained broad warranties as to NewSport's rights to license the photographs submitted thereunder and made clear that no separate permission from Zuma or anyone else was required to display, license, and distribute the photographs via Corbis. Bloom Decl. Ex. F § 6.1. The NewSport Contract also provided that Corbis was entitled to assign rights to the NewSport collection without further consent (e.g., through a transaction like the one Corbis eventually entered into with VCG). *Id.* §13.2.

In April 2012, Corbis renegotiated its agreement with NewSport, eliminating the royalty rate disparity between the NewSport contract and Zuma's own contract with Corbis. *See* Bloom Decl. Ex. Q at COR 00023; Walker Dep. (Bloom Decl. Ex. E) 25:2-5; Greenberg Dep. (Bloom Decl. Ex. A) 35:23-36:5 (discussing Corbis program to renegotiate contracts to reduce royalty rates). Deprived of any further financial benefit from continuing to submit images to Corbis under the NewSport Contract, Zuma requested new FTP credentials from Corbis so that it could "update [its] sports feed to have it go through the ZUMA Press Sports feed to Corbis" rather than continuing to go through the NewSport channel. Bloom Decl. Ex. CC at ZUM00288; Greenberg Dep. (Bloom Decl. Ex. A) 60:8-20, 62:6-19. Corbis, however, continued to treat NewSport as the authorized licensor of the all images submitted by Zuma under Corbis Contract #9995 as part of the NewSport collection. Walker Dep. (Bloom Decl. Ex. E) 36:13-37:6; *see infra* Section B.

### B.     All Images Submitted by Zuma Under NewSport's Contract with Corbis Remained Part of the NewSport Collection

On January 9, 2013, Walker terminated his employment relationship with Zuma. *See* Bloom Decl. Exs. FF, AA; Walker Dep. (Bloom Decl. Ex. E) 30:22-31:12. Shortly thereafter,

Zuma began unilaterally attempting to persuade Corbis to remove the so-called "Zuma images" from Corbis' NewSport collection (which was governed by the NewSport Contract) despite the representations it and NewSport had made in the Redirection Agreement.  On February 14, 2013, for example, Zuma emailed Corbis a request that all of the Zuma images be "deleted from Newsport (sic) account and moved over to ZUMA account."  Bloom Decl. Ex. GG at ZUM00343.  Evidencing its clear understanding that NewSport was the authorized licensor of those images, Corbis responded that it "cannot move any images that carry the NewSport contract number, which were submitted through the NewSport FTP, without written consent from NewSport."  *Id.*; *see also* Greenberg Dep. (Bloom Decl. Ex. A) 76:19-77:12 (Zuma's principal contact at Corbis (and current Zuma employee) Seth Greenberg testifying that he told Mc Kiernan "I can't move the images that are marked NewSport to the Zuma contract because I need written consent."); *id.* 63:24-64:11 ("In terms of changing the pictures that came through the NewSport feed to the Zuma contract . . . I needed proper paperwork.  It wasn't a simple process."); *id.* 65:18-25 ("I followed the protocol from the contract administration and legal teams at Corbis.  And I needed to have written permission from the person . . . who has rights over the contract that submitted the pictures to approve that move."); *id.* 70:9-15 ("I had communication with Zuma that I needed written permission.").

Zuma failed to memorialize any agreement with NewSport regarding the images it fed to Corbis under the NewSport Contract other than the Redirection Agreement in which Mc Kiernan and Walker affirmed that NewSport was the authorized licensor of those images.  NewSport, for its part, also understood that it had been authorized to represent those images:  Walker informed Zuma, for example, that "[a]s for those images feed (sic) through NewSports (sic) account, Newsport (sic) will represent those images and payment will be made as . . . Newsport (sic) does

with any of it (sic) other associate agencies feeding that account."  Bloom Decl. Ex. DD at

ZUM00327; *see also* Bloom Decl. Ex. EE at ZUM00294 ("As for the images feed (sic) through

my contract with Corbis, we will have to come to some agreement as there was never one in

place.  If we can not (sic) come to an agreement Newsport (sic) will pay those photographers

directly for sales through that contract.").

Months later, in June 2013, Mc Kiernan stated in an email that Zuma and its

photographers were aware that at that time "on Corbis (sic) sales portal, there are 50K+ worth of

our images under Newsport (sic)."  Bloom Decl. Ex. HH at ZUM00353.  In the same email, Mc

Kiernan also, at Corbis' "suggestion," provided Corbis with a roadmap for identifying the

images submitted by Zuma under the NewSport Contract by listing "the ZUMA [photog] codes

which of the CAT: SPO need to come down ASAP."  *Id*. at ZUM00353-54.  As these emails

show, Mc Kiernan and his Zuma colleagues knew that all photos submitted by Zuma to Corbis

using the NewSport FTP feed remained a part of the NewSport collection.  Mc Kiernan Dep.

(Bloom Decl. Ex. C) 130:19-24, 131:6-11.  Yet, although Corbis' Greenberg told Zuma that he

had not received the requisite written permission from NewSport to move the images out of the

NewSport collection, Greenberg Dep. (Bloom Decl. Ex. A) 70:17-71:2, Mc Kiernan still failed to

deliver the written consent from NewSport needed to move these images out from under the

NewSport Contract.  *See id.*  According to Greenberg, NewSport never provided Corbis with

written consent to the unwinding of the Zuma-NewSport arrangement.  *Id.* 67:13-23 ("I don't

recall any notification from NewSport to move those pictures back."); *id.* 68:12-24 (NewSport

"never provided the required consent").  There is no record evidence that NewSport ever

provided such written consent or that Corbis ever agreed to terminate its treatment of NewSport

as the rightful licensor of those works in the absence of such consent.

Greenberg further testified that he is not aware that the Zuma-submitted photos were ever removed from the NewSport collection, Greenberg Dep. (Bloom Decl. Ex. A) 68:25-69:15, 70:3-7, 75:10-76:18, 80:9-13, 83:20-22, and Walker and Mc Kiernan both testified that they have no knowledge that the removal ever occurred.  *See* Walker Dep. (Bloom Decl. Ex. E) 43:4-8 ("Q: Do you know what, if anything, Corbis actually did to disassociate the [Zuma] photos from the NewSport collection?  A:  No."); *id.* 45:13-15 ("I don't know what they did."); Mc Kiernan Dep. (Bloom Decl. Ex. C) 111:1-111:23 (testifying that he does not know if Corbis separated the Zuma photos from the NewSport photos).  All of the Photographs remained associated with the NewSport Contract in the metadata provided by Corbis to Getty Images, and NewSport—rather than Zuma—was identified as the source of each of them.  Declaration of Chris Eisenberg, dated June 29, 2018 ("Eisenberg Decl."), ¶ 12; *see also infra* pp. 21, 24.

## C.  The Sale of Corbis' Image Licensing Business to VCG and Getty Images' Agreement with VCG To Distribute Corbis Content for VCG Outside of China

In January 2016, VCG, through its affiliate Unity Glory International Limited,[3] entered into an agreement with Corbis under which VCG acquired ownership of and/or rights to substantially all of the content licensed under or associated with Corbis' image licensing business.  Bloom Decl. Ex. S at GETT00049377-78.  That same month, Getty Images entered into an agreement with VCG, which granted Getty Images an exclusive license to distribute worldwide (except in China) all content that VCG owned or had the right to license, including that obtained from Corbis.  *Id.* § 2.1.  The agreement provided for a process by which Getty Images, in its sole discretion, was to review all of VCG's Corbis content and identify that which Getty Images wished to "accept" and migrate to Getty Images' system.  *Id.* § 3.1.  The agreement

---

[3] VCG and Unity Glory International Limited are referred to collectively herein as "VCG."

contemplated that Getty Images would enter its own contributor agreements with Corbis

contributors whose content Getty Images wished to represent and that VCG would use

reasonable efforts to cause all contributors to terminate their respective agreements with VCG

and sign as Getty Images contributors subject to Getty Images' standard terms.  *Id.* § 3.4.2.  VCG

expressly warranted that it had sufficient rights in the Corbis content to grant Getty Images the

rights set forth in the agreement and that any content accepted by Getty Images pursuant to the

agreement would not infringe or violate any copyright.  *Id.* § 10.2.

>    **D.**    **The Migration of the NewSport Collection From Corbis to Getty Images, as**
>             **Expressly Authorized by Both VCG and NewSport**

Following the sale by Corbis of its photographic licensing business to VCG and VCG's

assignment of the right to distribute Corbis content outside of China to Getty Images, Getty

Images began reaching out to former Corbis contributors and image partners to discuss

prospective migration of their photographic assets.  Declaration of Elodie Mailliet, dated June

29, 2018 ("Mailliet Decl."), ¶ 5.  Rather than simply ingest all of Corbis's content without

notifying Corbis' contributors (as it had the right to do), *see* Bloom Decl. Ex. S § 2.1, Getty

Images endeavored to enter into new contributor agreements with those identified in Corbis'

records as the rightsholders to or authorized representatives of collections of interest to Getty

Images.  In addition to giving every potential partner the option to decide if it wanted to have a

relationship with Getty Images, it also ensured that Getty Images' new contributor relationships

would be governed by the same terms and conditions as Getty Images' existing relationships.

*See* Mailliet Decl. ¶ 4.

On April 4, 2016, Walker, in his capacity as the principal officer and director of

NewSport, executed a standard exclusive Contributor Agreement with Getty Images which

authorized Getty Images to migrate NewSport's collection from Corbis to Getty Images for

display and licensing on the Getty Images website.  Walker Decl. ¶¶ 37-38; Bloom Decl. Ex. T.

Although Walker inadvertently inserted his own name instead of "NewSport" in the box

designating the contributor/licensor, both parties understood and intended that the agreement

covered the NewSport content and that it was executed by Walker as a representative of

NewSport.  *See* Walker Decl. ¶¶ 37-38; Walker Dep. (Bloom Decl. Ex. E) 47:22-25 ("Q: Your

intention was to license the NewSport archive to Getty Images?  A: Yes, that's what I believe

I'm signing here."); Lindquist Decl. ¶ 9.  Walker followed up to ensure the "Newsport (sic)

photo agency content" from Corbis transferred over to Getty Images.  Bloom Decl. Ex. LL at

GETT00047204; Walker Dep. (Bloom Decl. Ex. E) 48:11-49:4.

     The NewSport Contributor Agreement contained a "Representations and Warranties"

section that included the following language: "[Y]ou represent and warrant to Getty Images that:

(i) you are the sole and exclusive owner of the Content submitted to Getty Images or are the

authorized representative of the applicable copyright owner(s) of such Content."  Bloom Decl.

Ex. T at GETT00051391.  Following the execution of that agreement, Getty Images began

migrating the NewSport content from Corbis and ingesting it into its own licensing system.[4]  The

system designed by Getty Images to migrate content from Corbis to Getty Images contained

multiple checks to ensure that there was a signed contract between Getty Images and the

contributor before any content could be migrated and published to the Getty Images website.

Declaration of Jamin Kortegard, dated June 29, 2018 ("Kortegard Decl."), ¶ 9(a) & (d).

---

[4] Plaintiffs have conceded that all of the photographs at issue in this case were submitted to
Corbis under the NewSport contract.  *See* Bloom Decl. Ex. YY (May 31, 2018 Letter from
Benjamin E. Marks to Richard Liebowitz).

E.    **Zuma's Initial Email Alleging Unauthorized Use, Getty Images' Removal of Migrated Images Containing References to Zuma in the Metadata, and Getty Images' Subsequent Investigation of Zuma's Claims**

On May 4, 2016, Zuma's Stewart notified Getty Images' Travis Lindquist by email that Zuma had found Zuma images on the Getty Images website that had not been authorized by Zuma.  Bloom Decl. Ex. NN at GETT00048272.  Stewart noted that the photo of David Beckham that he attached to his email was credited on Getty Images' website to "Les Walker Newsport (sic)," which, Stewart claimed (incorrectly), "never had rights to distribute out (sic) images."  *Id.*  That statement is inconsistent with the Redirection Agreement, signed by Zuma's CEO, which, as stated above, provided that NewSport was the authorized representative of all photographs submitted by Zuma to Corbis under the NewSport Contract.[5]  *See* Bloom Decl. Ex. Y.  Stewart was personally aware that Zuma had submitted photographs to Corbis under the NewSport Contract feed, Stewart Dep. (Bloom Decl. Ex. D) 35:3-18, 38:5-39:3, and that the Zuma-submitted photographs had remained part of the NewSport collection at Corbis after Walker's departure.  Bloom Decl. Exs. X, CC; Stewart Dep. (Bloom Decl. Ex. D) 70:13-71:1, 76:7-77:7.  But this information was conspicuously absent from Stewart's communications with Getty Images (as well as from all subsequent communications by Zuma and its counsel and from the pleadings in this case).  Bloom Decl. Ex. PP; Bloom Decl. Ex. SS at GETT00047463-64; *see also* Wojtczak Decl. ¶ 23.

Because Lindquist was not the appropriate person at Getty Images to handle Stewart's inquiry, Lindquist Decl. ¶ 13, he forwarded it to other Getty Images personnel and, by the following day, Getty Images had searched its system and identified some 26,000 photographs

---

[5] Stewart admitted that when he sent the email to Lindquist, he was not aware of the Redirection Agreement signed by Mc Kiernan, let alone of its express affirmation that NewSport was the authorized licensor of all images submitted to Corbis under the NewSport Contract.  Stewart Dep. (Bloom Decl. Ex. D) 73:24-74:4, 97:24-98:11.

with a reference to Zuma in the metadata, albeit in the free-text portion of the caption field, where credit information otherwise would not be found.  Eisenberg Decl. ¶¶ 11-12.  That same day, and even though the Corbis metadata indicated that NewSport—not Zuma—was the source of the images, Getty Images pulled them from its website pending further investigation.  Bloom Decl. Ex. QQ at GETT00047442 ("We had approx. 26k assets with a Corbis source of "Newsport" and "Zumapress" in the caption field, and Catherine temp pulled those on 5/5 so they should have been off the site since then."); Bloom Decl. Ex. PP at GETT00047149; Wojtczak Decl. ¶ 7; Walker Dep. (Bloom Decl. Ex. E) 68:20-22 (Q: "Do you know, did Getty take the images down?  A:  Oh, absolute—immediately.").  On May 19, 2016, Getty Images confirmed to Zuma that all of the images it had identified in response to Zuma's May 4 email had been pulled from the website by May 5.  Wojtczak Decl. ¶ 12.  Neither Stewart nor anyone else from Zuma responded to Wojtczak's May 19 email or communicated further with Getty Images concerning the matter.  *Id.* ¶¶ 12, 23; Bloom Decl. Ex. PP.

As Getty Images had no idea how images referencing Zuma had published to the Getty Images site, it continued, on its own, its urgent investigation into that question.  *See* Wojtczak Decl. ¶ 8; Eisenberg Decl. ¶ 14; Lindquist Decl. ¶¶ 14-16.  The major hindrance to that investigation was Zuma's decision to withhold from Getty Images any information concerning: (i) Zuma's submission of tens of thousands of photographs to Corbis under the NewSport Contract; (ii) the Redirection Agreement and its express affirmation that NewSport was the authorized licensor of images submitted to Corbis under the NewSport Contract; and (iii) Zuma's unsuccessful efforts to have Corbis remove the Photographs from the NewSport collection and Corbis' requirement of written authorization from NewSport, which NewSport never provided.  *See* Wojtczak Decl. ¶¶ 23-24; Bloom Decl. Ex. SS at GETT00047461, 00047463.

Nonetheless, Getty Images eventually was able to uncover a number of critical elements of the story through its own investigation, which took weeks because—in addition to Zuma's refusal to communicate the facts in its possession—Getty Images had difficulty reaching Walker who (as Getty Images learned) had relocated to Alaska and was frequently outside of cell or internet coverage.  Bloom Decl. Ex. TT at GETT00047178; *see also* Wojtczak Decl. ¶¶ 13, 18. On May 24, 2016, Walker finally responded by phone.  Wojtczak Decl. ¶ 13.  He confirmed that he was the authorized licensor of all the photographs submitted to Corbis under the NewSport Contract which had migrated from Corbis to Getty Images pursuant to the Contributor Agreement between NewSport and Getty Images, but he did not provide the corroborating documentary evidence requested by Getty Images of his relationships with the other individual photographers whose images were part of the NewSport collection.  *Id*. ¶¶ 13, 18; Bloom Decl. Ex. RR at GETT00047154; Bloom Decl. Ex. TT at GETT00047178.

While Walker confirmed that he himself had shot some of the photos in the NewSport collection, he also stated that other photographers represented by NewSport had shot most of them and that the crediting metadata in the Getty Images system, which was based on the way he had filled out Getty Images' contributor form, should have credited NewSport, not him. Wojtczak Decl. ¶ 13.  Getty Images had already been investigating whether the metadata on all assets associated with the NewSport Contract, including those with no Zuma reference, should credit NewSport rather than Les Walker.  The discussion with Walker provided further support for making the change, Eisenberg Decl. ¶ 19, so Getty Images revised the attribution on all assets associated with the NewSport Contract.  *Id.*

On May 24, Getty Images also became aware that there might be additional images associated with Corbis Contract #9995 on Getty Images' website containing a reference to Zuma

in the free-text portion of the caption field.  Wojtczak Decl. ¶ 15; Eisenberg Decl. ¶ 18. The

Getty Images content team therefore proactively ran new queries on the database of images on

the Getty Images website, discovered additional images on the site associated with Corbis

Contract #9995 (beyond those pulled on May 5), and promptly removed them.  Wojtczak Decl.¶

15; Eisenberg Decl. ¶ 18.

　　　　The presence of the additional images associated with Zuma resulted from the fact that

the migration of content from Corbis to Getty Images involved some seven million images and

was done on a rolling basis, in part due to the timing of Getty Images' receipt of signed

contributor agreements and in part due to technical limitations on the number of images that

could be migrated at any one time.  Wojtczak Decl. ¶ 16.  Getty Images' personnel learned that,

as a result of the volume of images, even some individual photographic collections from Corbis

were being migrated to the Getty Images website in batches, rather than all at once.  Eisenberg

Decl. ¶ 18; Wojtczak Decl. ¶¶ 16-17; Kortegard Decl. ¶ 12.  This meant that assets under the

same contract could and did appear on the website at different times, including on different days.

The NewSport collection, it turned out, was one of the collections that transferred in batches, and

only part of that collection had been uploaded to Getty Images website by May 5, when Getty

Images did its initial pull.  Wojtczak Decl. ¶ 17; Eisenberg Decl. ¶ 18.  As noted, when Getty

Images' internal team found additional, later-migrated Zuma images, they promptly pulled them

from the site.

　　　　On June 21, 2016, as a final precaution, Getty Images pulled all remaining images

associated with Corbis Contract #9995 from the Getty Images website, including those without

any reference to Zuma in the metadata.  Wojtczak Decl. ¶ 18; *see also* Bloom Decl. Ex. UU.

Getty Images took steps to block any future migrations of assets linked to any NewSport or Les

Walker contracts to ensure that no other potentially disputed assets migrated inadvertently to Getty Images.  Wojtczak Decl. ¶ 18.

On June 27, 2016, Zuma's outside counsel, Richard Liebowitz, sent a draft complaint to Getty Images' General Counsel and invited a discussion of Zuma's claims.  Wojtczak Decl. ¶ 19. With the benefit of the additional information learned over the course of nearly two months of investigation, and on the assumption that Zuma's awareness of the true facts would resolve the matter, Getty Images voluntarily supplied Zuma with a substantial amount of information concerning the alleged infringement—good-faith cooperation that has never been returned in kind by Zuma.  On July 6, 2016, for example, Wojtczak provided Mr. Liebowitz with an Excel file containing details on thirty-one photographs that Zuma had identified in Exhibit A to the draft complaint as "Photographs on the [Getty] Website."  Wojtczak Decl. ¶ 21; Bloom Decl. Ex. SS at GETT00047461, 65.  The file identified the asset number, contract/source (Les Walker/NewSport), and caption with photographer names of each photograph.  *See* Bloom Decl. Ex. SS at GET00047465.  On July 19, 2016, Wojtczak sent Mr. Liebowitz a list of all 47,048 photographs, which he identified as all of the assets that "ha[d] migrated from Corbis to Getty via the Les Walker/NewSport Corbis contract." Bloom Decl. Ex. VV.  Wojtczak stated: "If your client still has prior Corbis/NewSport asset information, these asset numbers . . . should line up with their original records."  *Id.* at GETT00047669.  Wojtczak advised Mr. Liebowitz that only 45,000 of the Zuma photos actually "went live" on the Getty Images website.  *Id.*; Wojtczak Decl. ¶ 22.  Wojtczak also advised him of the small amount of revenue the photographs had generated during the brief time they were on the Getty Images website.  Wojtczak Decl. ¶¶ 28-29.  Notwithstanding this diligent cooperation, the next communication on the matter Getty

Images received was the filing of Zuma's complaint on August 1, 2016 without further warning. Wojtczak Decl. ¶ 27.

**The Alleged Alteration of Copyright Management Information**

### A.    The Appearance of a "Double Byline"

The Corbis metadata for its assets did not have a unique field for credit information.  It had a unique field for photographer name and a unique field for agency name, but no unique field for attribution.  Kortegard Decl. ¶ 21.  Corbis also did not have metadata that associated attribution information with the caption field.  *Id.*  The caption field in the tens of thousands of Corbis images tested by Getty Images contained only a description of the image.  *Id.* ¶ 23.  The same is true of the overwhelming majority of the approximately seven million images Getty Images migrated from Corbis.  *Id.*

The credit information appearing at the end of the caption of the Photographs on the Getty Images website included two parenthetical blocks of credit text, one inherited from Corbis and one added (automatically and as permitted by its contributor agreements) by Getty Images. *See, e.g.*, Bloom Decl. Ex. CCC.  The first parenthetical, to take a representative example, stated "Credit Image: ¿¿¿¿ Manny Flores/Cal Sport Media/ZUMAPRESS.com."  The "¿¿¿¿" appeared where "Ã¿Â©" appeared in the original caption provided by Corbis.  Bloom Decl. Ex. EEE at Getty Images Master ID 527719520.  Manny Flores (a plaintiff) is the photographer/copyright owner; Cal Sport Media is the agency that sublicensed the photo to Zuma; and ZUMAPRESS.com is Zuma's website.

The second parenthetical—appended by Getty Images—read "Photo by Les Walker/Corbis via Getty Images."  The explanation for "Photo by Les Walker"—which Plaintiffs have continually mischaracterized as an intentional misrepresentation that Les Walker was the photographer, even though the actual photographer's name (viz., Manny Flores)

appeared first—is that, as stated above, in NewSport's April 2016 Getty Images Contributor Agreement Walker inserted his own name in the space for "Your name and address" and thus inadvertently identified himself, rather than NewSport, as the contributor.  Bloom Decl. Ex. T. Because of that error, Walker's name instead of "NewSport" was placed in the "attribution" field of the contract chart that Getty Images used to populate the credit line in the photo caption. Eisenberg Decl. ¶ 13; see also Kortegard Decl. ¶¶ 9(a), 15-17.  The second part of the Getty Images credit line ("Corbis via Getty Images") indicated accurately that the Photographs were obtained from Corbis and were being distributed by Getty Images.  Eisenberg Decl. ¶ 13.[6]

Both parentheticals appeared in the caption of the Zuma-associated photos that published to the Getty Images website—the so-called "double byline" issue—because the computer application written by Jamin Kortegard of Getty Images to migrate the Corbis assets appended the Getty Images credit information to the caption field of each asset (as it was supposed to) without recognizing that, for the Zuma-submitted images, Zuma had inserted a credit reference in the free-text caption field in the Corbis metadata.  Kortegard Decl. ¶¶ 20, 23.  Kortegard wrote the script on the understanding—based on weeks of collaboration with Corbis' data management specialists and extensive testing of Corbis metadata for thousands of assets—that credit information would *not* appear in the Corbis free-text caption field but would instead be captured elsewhere in the metadata fields associated with that specific information.  *See id.*

The presence of credit information in the Corbis caption metadata was "the result of the anomalous placement of attribution information in the Corbis caption field, rather than in the Corbis photographer name and agency fields.  Kortegard Decl. ¶ 24.  According to Kortegard, the "presence of a byline in the existing Corbis caption for the photos associated with Zuma

---

[6] As Mc Kiernan testified, it is "industry standard" to add the name of the licensing agency to the credit line.  Mc Kiernan Dep. (Bloom Decl. Ex. C) 86:16-24, 87:22-88:3.

Press was abnormal." *Id.* ¶ 19.  (A screenshot of a Zuma photograph on the Corbis website (Bloom Decl. Ex. CCC), which shows a Zuma credit parenthetical at the end of the caption, confirms Kortegard's testimony and suggests that this anomaly was caused by the manner in which Zuma captioned the photos it transmitted through the NewSport feed.)  Getty Images did not anticipate this anomaly because it had been told by Corbis that credit information would be found in the corresponding credit fields.  Kortegard Decl. ¶¶ 19-25.

Getty Images sought to automate as much of the migration process as possible to eliminate opportunities for user or manual error.  Kortegard Decl. ¶ 6; Eisenberg Decl. ¶¶ 5-7. However, Getty Images did not take the consistency of the Corbis metadata for granted.  As noted, extensive sampling by Getty Images of Corbis metadata was done prior to the migration, and it showed that the metadata received from Corbis could be found in the appropriate fields. Kortegard Decl. ¶¶ 20, 23; Eisenberg Decl. ¶ 8.

There was, in short, no reason for Getty Images to expect any of the photos in the NewSport collection to have credit information in the caption field of the metadata rather than in the appropriate metadata fields.  According to Kortegard, the addition of a second credit line was "not generated knowingly by Getty Images."  Kortegard Decl. ¶ 24.  In fact, he was "very surprised" to see the double credit line when it was brought to his attention after the complaint was filed.  *Id.*  As Kortegard explains, "The intent was always to preserve correct attribution for every photo by taking the photo description presented in the Corbis caption wholesale and appending a simple credit to the original photographer or entity and Corbis and Getty Images as distributors."  *Id*. ¶ 16.  Getty Images did not delete the photographer's name or Zuma's name or otherwise change the Corbis credit metadata.  Walker Dep. (Bloom Decl. Ex. E) 65:6-8 ("Q: [D]id Getty images change the meta data? A: Not at all.").

27

**B.     The Automated Replacement of Unrecognized Characters With Question Marks**

In some instances, the migration of metadata from Corbis to Getty Images resulted in the appearance of question marks in the metadata on the Getty Images site in place of characters and symbols in the Corbis metadata that were not recognized by Getty Images' software.  Kortegard Decl. ¶ 31.  This occasionally resulted in the substitution of character sets in Corbis metadata where a copyright symbol ("©") was replaced with one or more question marks.  *See* Bloom Decl. Ex. EEE, Getty Master ID#523958662 (Corbis' original caption "Team TelefÃ¿Â³nica continued their domination of the Volvo Ocean Race today . . . ." became "Team Telef¿¿¿¿nica continued their domination of the Volvo Ocean Race today . . . ."); *id.* Getty Master ID#527706814 (Corbis' original caption credit line "(Credit Image: Â© ASP/Cal Sport Media/ZUMAPRESS.com)" became "(Credit Image: ¿¿ ASP/Cal Sport Media/ZUMAPRESS.com)").

The substitution of question marks for unrecognized characters is a common phenomenon that also shows up in Zuma's documents and on its website.  *See, e.g.*, Bloom Decl. Exs. MM, AAA.  Zuma's Chief Technology Officer Patrick Johnson testified that question marks can be inserted automatically where, for example, ingested text contains Cyrillic characters.  Johnson Dep. (Bloom Decl. Ex. B) 23:2-11.  This is because all electronic devices process text through use of a character-encoding standard, like US-ASCII or Unicode, whereby each alphabetic, numeric, or special character is represented with a system of numbers.  Kortegard Decl. ¶ 27.  While many "character sets"—the combinations of characters that produce letters, numbers and symbols—are commonly found in each encoding standard, many character sets cannot be translated between systems.  *Id.* ¶ 29.  It is very common for an

encoding standard to display question marks as an automated response when it encounters a character set it does not recognize. *Id*. ¶ 26.

There is no evidence of any intent by Getty Images to remove the copyright symbol in order to obscure the provenance of an image.

### C.   The Getty Images Watermark

To discourage infringement or other unlicensed uses, Getty Images uses watermarks on images offered for licensing on its website.  Declaration of Ido Rekem, dated June 29, 2018 ("Rekem Decl."), ¶ 5.  Watermarks on the Getty Images website are not native to the images; they are, instead, applied to images by computer code "in real time" in response to requests by users to view the image. *Id.* ¶ 4.  When an unregistered user of the Getty Images website views an image, the image appears with a watermark consisting of the Getty Images logo, an attribution in smaller font immediately below the logo, and a Master ID number in the lower left.  Rekem Decl. ¶ 5; Bloom Decl. Ex. DDD.  The attribution, like that appearing in the photo caption credit, is derived from the contract associated with the asset. *Id.*

Zuma has pled the appearance of an allegedly incorrect watermark in support of its section 1202 claim. *See, e.g.*, Dkt. 36 ¶¶ 100-01.  As explained, however, the watermarks draw from the same set of metadata as the attribution (which derives from a signed contributor agreement) and are applied automatically.  Rekem Decl. ¶¶ 4-5.  The attribution in the watermark for those of the 47,048 images that published to the Getty Images website was "Les Walker" rather than "NewSport" because, as explained above, Walker incorrectly filled out his contributor agreement. *See supra* pp. 25-26.  The watermark for these images would have been subject to the same watermark display protocols on Getty Images' websites as any other images owned or licensed by Getty Images.  Rekem Decl. ¶ 6.

There is no evidence of any intent by Getty Images to use a watermark to induce, enable, facilitate, or conceal infringement.  To the contrary, the evidence conclusively shows that watermarks were only applied to the Photographs after the execution of a contributor agreement with NewSport, which Getty Images reasonably and in good faith believed was authorized to grant the licenses contained therein to Getty Images.

## ARGUMENT

## I.      THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if the evidence, viewed in the light most favorable to the nonmoving party, shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To defeat a properly made and supported motion for summary judgment, the opposing party must come forward with "specific facts showing a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(e)(2).  That factual evidence must be "of such a character that it would warrant the jury in finding a verdict in favor of" the nonmoving party.  *Anderson*, 477 U.S. at 251 (citation omitted).  Summary judgment cannot be defeated simply by raising "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or by adducing evidence that is "merely colorable . . . or is not significantly probative."  *Anderson*, 477 U.S. at 249 (citation omitted).

## II.     GETTY IMAGES' USE OF PLAINTIFFS' PHOTOS WAS AUTHORIZED, AND PLAINTIFFS ARE ESTOPPED FROM CONTENDING OTHERWISE

To prevail on a copyright infringement claim, the plaintiff must establish (i) ownership of a valid copyright and (ii) unauthorized copying of constituent elements of the work that are original.  *See, e.g.*, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996).  The existence of a license to engage in

the challenged copying is an affirmative defense.  *See United States Naval Inst. v. Charter Communic'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) ("[A]n exclusive licensee of any of the rights comprised in the copyright . . . cannot be liable for infringing the copyright rights conveyed to it."); *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007) ("A valid license . . . immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor."); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015) ("[A] copyright owner who grants an exclusive license or nonexclusive license to use a work waives any right to assert an infringement claim against the licensee, or against anyone whom the licensee is entitled to sublicense, for acts within the scope of the license or sublicense.").

### A.     Getty Images' Use of the Photographs Was Authorized

The claimed infringements in this case are not actionable because they were licensed. Getty Images was granted an exclusive license in April 2016 by NewSport to "distribute, market, sublicense, copy, reproduce, display, exhibit," etc. the photographs at issue in this litigation. Bloom Decl. Ex. T § 1.1.  Previously, in the November 2011 Redirection Agreement, Zuma had granted to NewSport "the authority to grant all rights and licenses under the [NewSport] Contract."  Bloom Decl. Ex. Y.  Because Plaintiffs have conceded that all of the photographs at issue were transmitted to Corbis under the NewSport Contract using a NewSport FTP feed, *see* Bloom Decl. Ex. YY, all of the Photographs are covered by the rights memorialized in the Redirection Agreement, i.e., they were legally part of the NewSport collection.  That grant of rights by Zuma to NewSport was never terminated; doing so would have required written instructions by NewSport to Zuma, which Plaintiffs concede never happened.  *See* Greenberg Dep. (Bloom Decl. Ex. A) 67:13-23, 68:12-24; *supra* pp. 14-16.  Therefore, NewSport's subsequent assignment, in April 2016, of exclusive licensing rights in the NewSport collection to

Getty Images gave Getty Images the right to reproduce, display, and distribute the Photographs notwithstanding the lack of direct authorization by Zuma to Getty Images.  *See Spinelli*, 96 F. Supp. 3d at 121 (stating that copyright claim may not be asserted against an authorized sublicensee for acts within the scope of the sublicense).

Getty Images' acquisition of exclusive rights to the NewSport collection (including the Photographs) from NewSport occurred in the wake of (and pursuant to) VCG's  grant to Getty Images of an exclusive license to distribute worldwide (except in China) all content VCG owned or had the right to license, including that obtained from Corbis.  Bloom Decl. Ex. S § 2.1.  That agreement specifically provided for a process by which Getty Images, in its sole discretion, was to review all of VCG's Corbis content and identify that which Getty Images wished to "accept" and migrate to Getty Images' system.  *Id.* § 3.1.  This transfer of rights to the Corbis assets contemplated contributor agreements such as the one Getty Images entered into with NewSport and therefore forecloses any argument that Getty Images did not properly acquire licensing rights to the entire NewSport collection.

### B.   Plaintiffs Are Equitably Estopped From Arguing That Getty Images' Use Was Not Authorized

Equitable estoppel provides an additional basis for granting summary judgment to Getty Images on Plaintiffs' infringement claims.  Equitable estoppel is "an equitable doctrine invoked to avoid injustice in particular cases."  *Slate v. Am. Broad. Co.,* 941 F. Supp. 2d 27, 40 (D.D.C. 2013) (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 59 (1984), *aff'd*, 584 F. App'x 2 (D.C. Cir. 2015)).  In the context of a copyright infringement action, the elements of equitable estoppel are: (1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct be acted on or must so act that the defendant has a right to believe that it so intended; (3) the defendant must be ignorant of the true facts; and (4) the

defendant must rely on the plaintiff's conduct to its injury.  *See, e.g.*, *DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 509 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir. 2001); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997); *Watermark Publishers v. High Tech. Sys. Inc.*, No. 95-3839-IEG (CGA), 1997 WL 717677, at *8 (S.D. Cal. June 18, 1997).

A plaintiff is estopped from asserting a copyright claim if it "aided the defendant infringing or otherwise induced it to infringe or has committed covert acts such as holding out . . . by silence or inaction."  *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (citation omitted); *see also Slate*, 941 F. Supp. 2d at 41 ("it is accepted that estoppel may be accomplished by a plaintiff's silence and inaction") (citation omitted); *Keane*, 968 F. Supp. at 947 (holding that silence coupled with willing assistance constituted conduct on which defendant was entitled to rely).

Undisputed facts, all flowing from Zuma's submission of the Photographs to Corbis under the NewSport Contract, establish each of the elements of equitable estoppel.

*First*, as to knowledge of the infringing conduct, Zuma knew that: (i) by submitting the photographs at issue to Corbis under the NewSport Contract, Corbis would treat NewSport as the authorized licensor of the images and rely on the express representations and warranties to that effect; (ii) the photographs Zuma submitted to Corbis under NewSport's contract had never been removed from Corbis' NewSport collection; (iii) in the absence of a written request by NewSport to move the Zuma photographs out of the NewSport collection, Corbis continued to have the right under the NewSport Contract to license the Photographs; and (iv) as a result of its agreement with VCG (via Unity Glory), Getty Images planned to migrate Corbis assets onto its own system.  *See supra* pp. 14-18.  Thus, Zuma knew of the allegedly infringing conduct (the

migration of Corbis assets, which included the Photographs, to Getty Images). Even if Zuma had *not* known of Getty Images' intent to migrate content from Corbis, by virtue of the Redirection Agreement, Plaintiffs "stand in the shoes" of both Corbis and NewSport, each of which was expressly informed as to, and played an essential role in, Getty Images' contemplated use of the Photographs. *Keane*, 968 F. Supp. at 947.

*Second*, as for whether Zuma intended that its conduct be acted on and gave Getty Images "a right to believe it was so intended," *Keane*, 968 F. Supp. at 947 (citation omitted), in the Redirection Agreement Zuma, jointly with NewSport, authorized Corbis to license the Photographs as if they were NewSport photos under the terms of the NewSport Contract, and Corbis was entitled to assign the NewSport Contract without further consent. *See supra* p. 14. Zuma certainly intended for Corbis and NewSport to treat the Photographs as governed by the NewSport Contract so that Zuma would receive a higher royalty rate than was provided for in its own contract with Corbis. The transaction Corbis eventually entered into with VCG, which in turn led to Getty Images' acquisition of the licensing rights to the NewSport collection, *see supra* pp. 17-18, 31-32, thus fell within the scope of the rights Zuma expressly conveyed to Corbis. The indirect nature of the relationship between Zuma and Getty Images is immaterial because Getty Images is the successor-in-interest to (and in contractual privity with) VCG and the licensee of (and in contractual privity with) NewSport. *See Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1131 (Fed. Cir. 2013) (in patent case, holding that equitable estoppel applies to successor-in-interest where privity has been established). As in *Keane*, moreover, there "was nothing to indicate to [Getty Images] that [it was] unauthorized" to ingest any part of the NewSport collection, 968 F. Supp. at 948; to the contrary, the evidence "clearly supports [Getty Images'] reasonable assumption that [it was] entitled" to ingest the entire NewSport collection. *Id.*

Further, Getty Images did not "fail to inquire as to its rights where that would be the prudent course of conduct." *Id.*

Zuma, by contrast, failed to take any action to prevent Getty Images from acquiring the Photographs, even though it was told by Getty Images of the migration of Corbis assets. *See* Mailliet Decl. ¶ 6.  In addition to failing to extricate the Photographs from the NewSport collection, Zuma never warned Getty Images that the Photographs were included in the NewSport collection and tied to the same Corbis contract (#9995) on the Corbis system.  Thus, through "silence and inaction," *Slate*, 941 F. Supp. 2d at 41, Zuma allowed Getty Images to engage unknowingly in the very conduct—the licensing and migration of the NewSport collection—on which Plaintiffs' infringement claims are based.

*Third*, Getty Images was unaware, as it ingested the NewSport collection, that the Photographs were included as the result of Zuma's use of NewSport's FTP path in order to increase its royalty rate.  Nor was Getty Images aware of any dispute concerning NewSport's right to license the Photographs to Getty Images.  Wojtczak Decl. ¶ 23.  Plaintiffs have failed to adduce a shred of evidence to the contrary.

*Fourth*, Getty Images relied on NewSport's apparent authority to license the Photographs to its detriment, "as evidenced by the present copyright infringement claim." *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1400 (C.D. Cal. 1990).

Accordingly, even if the Court were otherwise inclined to find a genuine issue of material fact as to whether Getty Images' use of the Photographs was authorized, Plaintiffs are equitably estopped from arguing that it was not, as in doing so they effectively would be seeking to hold Getty Images liable for Zuma's conduct.  For this additional reason, Plaintiffs' infringement claims fail as a matter of law.

III.    **PLAINTIFFS HAVE NO STANDING TO SUE FOR INFRINGEMENT OF MORE THAN 12,000 OF THE PHOTOGRAPHS THEY ATTEMPTED TO PLACE AT ISSUE**

Section 501(b) of the Copyright Act provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b).  Where the plaintiff is not the author, it may sue for infringement only if it has acquired ownership of the copyright or an exclusive license to the work.  *Davis*, 505 F.3d at 101; *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 276 (S.D.N.Y. 2014), *aff'd*, 882 F.3d 394 (2d Cir. 2018); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.02[B][1].[7]

In its ruling on Getty Images' motion to dismiss the First Amended Complaint, the Court stated that if, after discovery, "it turns out that Zuma does not have an exclusive agreement with respect to a particular photograph, Getty may move for summary judgment with respect to that photograph."  Dkt. 33 at 7.  Getty Images is now doing so.

Despite Zuma's allegation (repeated in pleadings filed after it had been shown to be false) that it has "a significant copyright ownership interest in the copyrighted works that are the subjects of this litigation," Dkt. 36 ¶ 36, Plaintiffs have failed to produce evidence of either copyright ownership or an exclusive license as to 13,578 of the Photographs.  These include (i) all of the photographs owned by the twenty-seven photographers Plaintiffs sought unsuccessfully to add to the case as plaintiffs; (ii) photographs owned by John Pyle, who moved to intervene on the ground that Zuma did not have an exclusive license to his works; and (iii) other works as to which no Plaintiff has produced an exclusive license.

---

[7] The Copyright Act defines "transfer of copyright ownership" to include an exclusive license. 17 U.S.C. § 101.

Plaintiffs have conceded lack of standing as to (i) and (ii).  *See* Bloom Decl. Ex. YY

(May 17, 2018 Letter from Richard Liebowitz to Benjamin E. Marks).  As for (iii), the a list of

photographers as to whom Zuma has failed to produce an exclusive license or any other evidence

of ownership of their works can be found in the Bloom Declaration.  Bloom Decl. Ex. 62.  For

all of these works, Plaintiffs have failed to raise a genuine issue of material fact as to standing,

warranting summary judgment for Getty Images.

## IV.    GETTY IMAGES DID NOT VIOLATE SECTION 1202

Plaintiffs assert claims under section 1202(a) and (b) of the Copyright Act in an effort to

recover a statutory damage award ranging into the hundreds of millions if not billions of dollars

under section 1203.  The purported basis for this absurd claim consists of inadvertent anomalies

in the metadata associated with the Photographs as they appeared on the Getty Images website

that derived from the NewSport Contributor Agreement and the automated nature of the mass

migration of photographs from Corbis.  In the absence of any evidence that the objected-to

changes were done both intentionally and in order to induce, conceal, enable, or facilitate

infringement, the section 1202 claims fail as a matter of law.

CMI includes: (i) the name of and other identifying information about the author or

copyright owner of a work; (ii) the information set forth in the notice of copyright; (iii) the terms

and conditions for use of the work; and (iv) links to such information.  17 U.S.C. §§ 1202(c)(1),

(2), (3), (6), (7).  Section 1202(a) prohibits falsifying CMI "knowingly and with the intent to

induce, enable, facilitate, or conceal infringement," 17 U.S.C. § 1202(a), while section 1202(b)

prohibits "intentionally remov[ing] or alter[ing]" CMI "knowing, or . . . having reasonable

grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right

under this title" without the authority of the copyright owner.  17 U.S.C. § 1202(b).

A typical violation of section 1202 in a case involving photography occurs when an infringer removes or alters CMI associated with an image so as to pass it off as its own.  *See, e.g.*, *Reilly v. Plot Commerce*, No. 15-CV-05118 (PAE) (BCM), 2016 WL 6837895, at *6 (S.D.N.Y. Oct. 31, 2016).  However, because the statute requires that the violation be intentional, a 1202(b) claim is viable only where the defendant is "aware of the appropriate uses of [the plaintiff's] CMI and *chose to alter the information* regardless." *Banxcorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 610 (S.D.N.Y. 2010) (emphasis added); *see also Chevrestt v. Am. Media, Inc.*, 204 F. Supp. 3d 629, 632 (S.D.N.Y. 2016) (dismissing section 1202(b) claim for failure to allege facts supporting inference that alteration or removal of CMI was done intentionally).

In addition to having to show intentional alteration or removal of CMI, to prevail on a section 1202(b) claim, the plaintiff also must show that the defendant "possess[ed] the mental state of knowing, or having a reasonable basis to know, that his actions 'will induce, enable, facilitate, or conceal' infringement."  *Stevens v. CoreLogic, Inc.*, No. 16-56089, 2018 WL 3040129, at *3 (9th Cir. June 20, 2018).  That is, the plaintiff "must make an affirmative showing, such as by demonstrating a past 'pattern of conduct' or 'modus operandi', that the defendant was aware of the probable future impact of its actions." *Id.* at *4.  The Ninth Circuit recently explained in *Stevens* that the "induce, enable, facilitate or conceal" requirement was "intended to limit liability . . . to instances in which the defendant knows or has reasonable basis to know that the removal or alteration of CMI . . . *will* aid infringement."  *Id.* at *5 (emphasis in original).

As explained below, the undisputed facts show that Getty Images did not knowingly or intentionally falsify, alter, or remove CMI, nor, as in *Stevens*, have Plaintiffs "offered any

evidence to satisfy th[e] mental state requirement" relating to the purpose of any manipulation of CMI.  *Id.* at *4.

### A.      There Was No Knowing Falsification, Alteration, or Removal of CMI

Plaintiffs may argue that the addition of "Photo by Les Walker" to the caption of the Photographs constituted falsification of CMI in violation of section 1202(a) because Les Walker was not the photographer.  ("Corbis via Getty Images" is not even arguably false, as the Photographs did, in fact, come from Corbis to Getty Images.)  However, the Court need not resolve whether any claimed confusion as to the identity of the photographer constitutes falsification within the meaning of section 1202(a) because, as explained above, it is indisputable that crediting Les Walker rather than NewSport was not done "knowingly" by Getty Images, *see supra* pp. 25-26, and thus is not actionable.

The same conclusion pertains if the full credit added by Getty Images—"Photo by Les Walker/Corbis via Getty Images"—is considered an "alteration" of CMI under section 1202(b) despite comporting with industry standard practice; it was not done knowingly and thus is not actionable.  As discussed above, the "double byline"—which Getty Images itself immediately pointed out to Zuma, *see* Bloom Decl. Ex. PP ("This is clearly a technical issue as they (sic) are two bylines on the images.")—resulted from the anomaly whereby some of the NewSport images (those associated with Zuma photographers) contained credit information in the free-text caption field rather than in the proper metadata fields.  *See supra* pp. 26-27.  As Kortegard explained, the double byline "certainly was not generated knowingly by Getty Images."  Kortegard Decl. ¶ 24.  He was not even aware of the issue until after this case was filed, and he was "very surprised to see it."  *Id.*

Getty Images did not intentionally add a second photographer's name ("Les Walker"), as Plaintiffs may argue.  The insertion of "Les Walker" in the credit occurred because, as explained

above, Walker erroneously inserted his own name into the NewSport-Getty Images Contributor Agreement, such that his name, rather than "NewSport," was automatically inserted into the "attribution" column" in the Getty Images contract chart and then into the photo credit line for the Photographs. Eisenberg Decl. ¶ 13; *supra* pp. 25-26. (A similar process resulted in "Les Walker" being the attribution for the Photographs in the Getty Images watermark. *See* Rekem Decl. ¶¶ 4-5.) The caption was assembled automatically according to rules devised with Corbis that were used for the entire Corbis migration, of which the NewSport collection was a tiny part. As Kortegard explains, the intent was to "preserve the correct attribution for every photo by taking the photo description presented in the Corbis caption wholesale and appending a simple credit to the original photographer or entity and Corbis and Getty Images as distributors." Kortegard Decl. ¶ 16; *see also* Eisenberg Decl. ¶ 13. There was, in short, no knowing falsification of CMI in violation of section 1202(a).

With respect to section 1202(b), apart from the unintentional, automated replacement of the copyright symbol with question marks in the photo caption credit on the Getty Images website, there was no removal of any CMI. And the question marks indisputably were not inserted intentionally. As explained, the appearance of "?" instead of "©" was a computer character recognition issue, Kortegard Decl. ¶¶ 26, 31-32, a common phenomenon (*see supra* p. 28) that also shows up in Zuma's own documents. *See, e.g.*, Bloom Decl. Exs. AAA, MM.

Plaintiffs can adduce no evidence that Getty Images sought with the question marks to obscure the identity of the copyright owner. To the contrary, the appearance of question marks in the photo description in certain captions confirms that there was no deliberate targeting of the copyright symbol. *See* Bloom Decl. Ex. EEE, Getty Master ID#523958662 (Corbis' original caption, "Team TelefÃ¿Â³nica continued their domination of the Volvo Ocean Race today . . . ."

became "Team Telef¿¿¿nica continued their domination of the Volvo Ocean Race today . . . ."). As a comparison of the original Corbis caption to the Getty Images caption clearly reveals, in each instance, the appearance and number of question marks correlates directly with an odd character set in the Corbis caption. This was, as stated, simply a character recognition issue: When the computer encountered combinations of characters that it could not translate, it replaced those characters with question marks.

The bottom line is that that the NewSport collection was migrated in the same manner as all other Corbis collections—it was not singled out in any way—which is fatal to Plaintiffs' section 1202 claims.[8]

## B.     There Was No Effort to Induce, Enable, Facilitate, or Conceal Infringement

Another independently sufficient ground for granting summary judgment to Getty Images on Plaintiffs' section 1202 claims is that any falsification, removal, or alteration of CMI was not done order to "induce, enable, facilitate, or conceal an infringement." In the first place, there was no infringement. *See supra* Point II. But even if the Court were to deny summary judgment to Getty Images as to infringement, the record demonstrates beyond dispute that any infringement was unintentional and thus cannot support a section 1202 claim. *See, e.g.*, *Bryant v. Europadisk, Ltd.*, No. 07 Civ. 3050 (WGY), 2009 WL 1059777, at *7-8 (S.D.N.Y. 2009), *aff'd sub. nom.*, *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) (holding that music distributor was innocent infringer where it was party to an agreement with plaintiff's marketing agent that gave it a non-exclusive right to distribute plaintiff's sound recordings and contained an express warranty that such distribution would not infringe the rights of third

---

[8] The unexpected presence of credit metadata in the photo caption information inherited from Corbis led to the *opposite* of the typical CMI claim: Instead of Plaintiffs' CMI being deleted in order to conceal infringement, the complaint here, where Plaintiffs' CMI was *retained*, is that there was *too much* CMI.

parties).  To the contrary, Getty Images ingested the NewSport photos in the reasonable, good-faith belief that it had secured all necessary rights to them from the authorized licensor.  In addition, Getty Images promptly removed all photos associated with Zuma from its website after being contacted by Zuma pending further investigation (the fruits of which it shared with Zuma), thereby demonstrating its good faith.  *See Bryant*, 2009 WL 1059777, at *7 (noting that distributor "immediately ceased its infringing conduct" when made aware of plaintiff's claim).

As a matter of law, in the absence of actual knowledge of infringement—of which there is none here—willful infringement can be established only where the defendant's action was "the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005); *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012), *aff'd*, 748 F.3d 120 (2d Cir. 2014).  In *Psihoyos*, by way of counter-example, such a showing consisted of evidence that the defendant (1) made no effort to curb its infringement after becoming aware that the plaintiff's photographs had been used without a license or outside the scope of the license; (2) lacked a license compliance program; (3) had violated license agreements numerous times in the past; and (4) may have attempted to cover up its infringements.  2012 WL 5506121 at *2.

The evidence here shows just the opposite.  Specifically, Getty Images: (1) had no knowledge of the claimed infringement and pulled the images referenced by Zuma as quickly as it could after Zuma notified it of the issue; (2) had procedures to ensure that no assets migrated from Corbis until a contract covering those assets was in place; and (3) was voluntarily forthcoming with information relating to Zuma's infringement claims.  *See supra* pp. 19, 20, 24.

Any attempt to characterize the alleged infringement by Getty Images as intentional based on the claim that Getty Images "should have done more" in terms of due diligence on the Photographs, *see, e.g.*, Dkt. 1 ¶ 17, also would fail to establish willful infringement as a matter of law.  Absent an extreme departure from a standard of care (of which Plaintiffs have adduced no evidence), that argument would sound in negligence, not reckless disregard.  *See Grateful Dead Prods., Inc. v. Auditory Odyssey*, 76 F.3d 386, at *1 (9th Cir. 1996) (unpub.) (holding that district court's finding that defendants "knew or should have known" that title in copyrighted works was unclear was consistent with conclusion that defendants were "negligent, but not willful"; it was not a finding that defendants "knew they were infringing on plaintiffs' copyrights" or that defendants acted "with deliberate indifference" to plaintiffs' rights); *Waran v. Christies, Inc.*, No 16-cv-1386, 2018 WL 2452758, at *5 (S.D.N.Y. May 31, 2018) ("While Waran may have an argument that Christie's should have done more, that amounts to negligence, not recklessness . . . . There is no indication that the consignors' provenance information raised any red flags that Christie's should have but failed to notice.").

There is no factual basis to base a finding of negligence, let alone recklessness, on Plaintiffs' repeated suggestion that the appearance of "Zuma" in the Corbis caption was a "red flag" that should have alerted Getty Images to Zuma's ownership claim.  As Getty Images' Chris Eisenberg explains, "Zuma" appeared only in the caption in the Corbis metadata, not in the source field, and thus did not indicate that Zuma owned the images.  Eisenberg Decl. ¶ 12; Bloom Decl. Ex. NN ("Other than the free-text caption, none of the usual credit fields reference Zuma Press.").  To the contrary, the Corbis contract ID with which the Zuma images were associated indicated that the images belonged to NewSport, not to Zuma.  *See* Eisenberg Decl. ¶ 12.  As shown by the unobjected-to credit lines of certain of the Photographs as they appeared on

the Corbis website, moreover, *see* Bloom Decl. Ex. ZZ,[9] there is nothing unusual about the appearance of multiple photo agencies in credit lines.  Zuma's own sublicensing of other agencies' images is similarly reflected in credits with references to multiple agencies.  *See* Bloom Decl. Ex. BBB.  In short, the claim that the appearance of "Zuma" in the credit line should have triggered scrutiny of NewSport's authority to license the Photographs has no merit.

Even if there were a genuine issue of material fact as to whether Getty Images infringed the Photographs intentionally—and there is not—there is, as factual matter, no causal link between the claimed CMI alteration/removal and the claimed infringement; to the contrary, by retaining the photographer name and Zuma's name in the captions, Getty Images effectively disclosed the provenance of the Photographs; there was no concealment of the claimed infringement.  Nor did the second parenthetical in the caption credit induce, enable, or facilitate unlawful copying by Getty Images (or anyone else).  Plaintiffs therefore cannot show that infringement (even if intentional) was "likely . . . to occur as a result of the removal or alteration of CMI," *Stevens*, 2018 WL 3040129, at *5, and thus cannot establish a violation of section 1202(b).

For all these reasons, the section 1202 claims fail as a matter of law.

---

[9] Bloom Decl. Ex. ZZ is a screenshot of a photograph as it appeared on the Corbis website with metadata containing a reference to Zuma in the caption field and a separate "Credit" field with the following attribution: "©Zak Noyle/NewSport/Corbis".

## <u>CONCLUSION</u>

For the foregoing reasons, Getty Images' motion for summary judgment should be

granted.

Dated:  New York, New York     Respectfully submitted,
   June, 29, 2018

           By:  <u>/s/ Benjamin E. Marks</u>
             Benjamin E. Marks
             Jonathan Bloom

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York  10153
           Tel:  (212) 310-8000
           Fax:  (212) 310-8007

           *Attorneys for Defendant Getty Images (US), Inc.*