# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ZUMA PRESS, INC., ACTION SPORTS
PHOTOGRAPHY, INC., TIYU (BEIJING)
CULTURE MEDIA CO. LTD., MANNY
FLORES, ANDREW DIEB, CHRISTOPHER
SZAGOLA, LOUIS LOPEZ, CHARLES BAUS,
DUNCAN WILLIAMS, ROBERT BACKMAN,
JOHN MIDDLEBROOK, and ANTHONY
BARHAM,

                  Plaintiffs,

      v.

GETTY IMAGES (US), INC.

                  Defendant.

Case No.: 1:16-cv-06110 (AKH)

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................1

COUNTER-STATEMENT OF UNCONTROVERTED FACTS ...................................................5

    Plaintiffs' Failure To Establish Ownership of Nearly One Half of the Works
Alleged To Be at Issue........................................................................................................5

    Plaintiffs' Consent To License Their Photographs Through NewSport and Corbis ..........8

    Getty Images' Acquisition of the Rights To License Corbis Assets, Including the
NewSport Collection..........................................................................................................11

    Getty Images' Ingestion of Corbis Assets Following the Execution of New
Contributor Agreements......................................................................................................12

ARGUMENT ..............................................................................................................................15

I.    GETTY IMAGES DID NOT COPY PLAINTIFFS' WORK WITHOUT
    AUTHORIZATION ..........................................................................................................15

II.    PLAINTIFFS' CANNOT OVERCOME GETTY IMAGES' AFFIRMATIVE
    DEFENSES OF EQUITABLE ESTOPPEL, ACQUIESCENCE, WAIVER, AND
    UNCLEAN HANDS ..........................................................................................................21

    A.    Equitable Estoppel ................................................................................................22

    B.    Acquiescence, Waiver, and Unclean Hands ........................................................26

        1.    Acquiescence .............................................................................................26

        2.    Waiver .......................................................................................................27

        3.    Unclean Hands ..........................................................................................28

III.    PLAINTIFFS CANNOT PROVE COPYRIGHT OWNERSHIP FOR NEARLY
    ONE HALF OF THE 47,048 PHOTOGRAPHS ALLEGED TO BE AT ISSUE............30

    A.    Plaintiffs Have Abandoned Their Infringement Claims as to 13,592 Works........31

    B.    Plaintiffs Do Not Have an Ownership Interest in Photographs by
        Bachalov, Cahn, Makela, or Sobhani....................................................................31

    C.    Plaintiffs Have Not Established an Ownership Interest in the 879
        Photographs Licensed Through Osports or CSPA.................................................32

    D.    Plaintiffs Have Not Established an Ownership Interest in the 7,450
        Photographs Licensed Through Action Sports ....................................................33

CONCLUSION..........................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Records, Inc. v. Taylor*,
No. 09 Civ. 9938(KBF), 2012 WL 1675589 (S.D.N.Y. May 14, 2012) .......................... 26-27

*Broad. Music, Inc. v. Hearst/ABC Viacom Entm't Servs.*,
746 F. Supp. 320 (S.D.N.Y. 1990)..................................................................................29

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998)...........................................................................................30

*Chic Home Design LLC v. New Journey Grp., Ltd.*,
No. 1:15-cv-09468 (JPO), 2017 WL 3738775 (S.D.N.Y. Aug. 30, 2017) .............................34

*Christians of Cal., Inc. v. Clive Christian N.Y., LLP*,
No. 13-CV-275 KBF, 2014 WL 4743422 (S.D.N.Y. Sept. 15, 2014)....................................33

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)........................................................................................................34

*Dynamic Sols., Inc. v. Planning & Control, Inc.*,
646 F. Supp. 1329 (S.D.N.Y. 1986)................................................................................29

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)........................................................................................................30

*Friedus v. Sardelli*,
192 A.D.2d 578 (2d Dep't 1993)....................................................................................20

*Int'l Media Films, Inc. v. Lucas Entm't, Inc.*,
703 F. Supp. 2d 456 (S.D.N.Y 2010).........................................................................31, 34

*Keane Dealer Serv., Inc. v. Harts*,
968 F. Supp. 944 (S.D.N.Y. 1997).................................................................................22

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002)...........................................................................................22

*McCormick v. Cohn*,
No. CV 90-0323, 1992 WL 687291 (S.D. Cal. July 31, 1992), *aff'd*, 17 F.3d 395 (9th Cir.
1994) (unpublished table decision).............................................................................. 29-30

*Mendel v. Henry Phipps Plaza W., Inc.*,
6 N.Y.3d 783 (2006) ......................................................................................................20

*Estate of Nelson v. Rice*,
  198 Ariz. 563 (Ct. App. 2000) ..................................................................................21

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  134 S. Ct. 1962 (2014) ............................................................................................30

*Rajamin v. Deutsche Bank Nat'l Tr. Co.*,
  757 F.3d 79 (2d Cir. 2014) ......................................................................................20

*Richard J. Zitz, Inc. v. Pereira*,
  225 F.3d 646 (2d Cir. 2000) (table, text at 2000 WL 1239830) ..............................33

*Societe Civile Succession Richard Guino v. Beseder Inc.*,
  No. CV 03-1310-PHX-MHM, 2006 WL 2917349 (D. Ariz. Oct. 6, 2006) ............29

*Spinelli v. Nat'l Football League*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015)........................................................................27

*Weinstein Co. v. Smokewood Entm't Grp., LLC*,
  664 F. Supp. 2d 332 (S.D.N.Y. 2009) ....................................................................32

*Wilson v. Clark*,
  No. 84 Civ. 5076 (LBS), 1986 WL 354 (S.D.N.Y. May 1, 1986)....................20-21

*Worldwide Home Prods, Inc. v. Bed Bath & Beyond, Inc.*,
  No. 11 Civ. 03633(LTS)(MHD), 2013 WL 247839 (S.D.N.Y. Jan. 22, 2013) ......29

## Statutes

17 U.S.C. § 101 ....................................................................................7, 32, 33, 34

17 U.S.C. § 201 ......................................................................................................34

17 U.S.C. § 204 ..................................................................................................6, 32

17 U.S.C. § 410 ..................................................................................................8, 34

## Treatises

4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT §13.09[B] (Matthew Bender,
  rev. ed.) ..................................................................................................................30

5 William F. Patry, PATRY ON COPYRIGHT § 17:127 ..............................................30

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant Getty Images (US), Inc. ("Getty Images") submits this memorandum of law in opposition to Plaintiffs' motion for partial summary judgment.

## PRELIMINARY STATEMENT

In its memorandum of law in support of its own motion for summary judgment, Getty Images demonstrated that Plaintiffs' copyright infringement claims fail as a matter of law. Getty Images showed that its use of the 47,048 sports photographs at issue was authorized and that Plaintiffs should be estopped from claiming otherwise. Specifically, undisputed facts establish that lead Plaintiff Zuma Press, Inc. ("Zuma")—on behalf of itself and as agent for the remaining Plaintiffs—granted licensing rights in the photographs to NewSport Photography, Inc. ("NewSport") in order to take advantage of the higher royalty rate NewSport received under its contract with their mutual distributor, Corbis Corporation ("Corbis"). In order to receive royalty payments directly from Corbis, Zuma entered into an agreement with Corbis and NewSport (the "Redirection Agreement") containing an express affirmation that NewSport was the authorized licensor of all photographs submitted under the NewSport-Corbis contract. Beginning in October 2011 and continuing until mid-2012, Zuma itself submitted each of the photographs to Corbis for licensing under NewSport's contract using a file-transmission protocol ("FTP") path provided by Corbis to NewSport. Those photographs remained part of the NewSport collection on Corbis after Zuma resumed submitting sports photographs to Corbis under its own contract, and when they were migrated to Getty Images, they were (properly) attributed to NewSport in the associated metadata.

In 2016, Corbis sold its image-licensing business to Unity Glory International Limited, an affiliate of a Chinese image licensor known as VCG (collectively, "VCG"), and VCG and Getty Images entered into a distribution agreement for Getty Images to license (outside of China)

photographs previously licensed by VCG through Corbis.  Notwithstanding this grant of rights from VCG, Getty Images undertook to enter into new contributor agreements with the authorized representatives of the collections that Getty Images wished to ingest from Corbis.  As part of that initiative, Getty Images entered into an agreement with NewSport that conveyed to Getty Images rights to all of NewSport's photographs that resided with Corbis (which still included the photographs supplied to Corbis by Zuma under NewSport's contract).  Pursuant to the distribution agreement between VCG and Getty Images and the contributor agreement with NewSport, Getty Images migrated NewSport's photos from Corbis onto its own system.  That fully licensed migration is the basis of Plaintiffs' meritless infringement claims.

In their cross-motion for partial summary judgment, Plaintiffs give the game away by admitting that (i) every photograph at issue was submitted to Corbis by Zuma for distribution under the NewSport-Corbis contract and (ii) Getty Images acquired the right to license Corbis assets through VCG.  *See* Dkt. 130, Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Plaintiffs' Mem.") at 4-5.  Plaintiffs try to skirt these crippling concessions by arguing that they *did not license to Getty Images directly*.  This is true but irrelevant; it has no bearing on the validity of the chain of authorizations—starting with the Plaintiffs themselves—that resulted in Getty Images lawfully acquiring the right to copy, display, and distribute the photographs.

Plaintiffs also contend that the photographs were not licensed to Getty Images indirectly either, but their effort to demonstrate this has no merit.  *First*, Plaintiffs contend that they did not license to Getty Images indirectly because they never communicated with Getty Images directly.  This is a non sequitur.  Moreover, Zuma's CEO, in his sworn testimony, admitted that an indirect license does not require direct communication between the rightsholder and the licensee.

*Second,* Plaintiffs assert that the NewSport Contributor Agreement only gave Getty Images rights to a separate collection of personal photographs owned by NewSport's President, Les Walker, and not to the NewSport collection.  This is incorrect:  Walker testified unequivocally that the Contributor Agreement was for the NewSport collection, and that testimony is corroborated by the testimony of Getty Images executives and by contemporaneous documents produced by Getty Images.

*Third*, Plaintiffs assert that even if Walker conveyed rights to the NewSport collection, he did not intend to include the photographs that Zuma submitted to Corbis under the NewSport-Corbis contract.  In addition to conflicting with statements that Walker made to Getty Images, Plaintiffs, as non-parties to the NewSport Contributor Agreement, lack standing even to make this argument.  Even if Plaintiffs had standing, moreover, any purported misunderstanding by Walker as to the contents of the NewSport collection would not provide grounds to override the grant of rights to Getty Images.  Nor is it material that Zuma may have *tried* to extract the photographs from the NewSport collection, given the undisputed evidence that it failed to do so.

*Fourth*, Plaintiffs attempt to discredit the authorization to Getty Images via Corbis' assignment of rights to VCG, and VCG's subsequent conveyance of distribution rights to Getty Images, by calling VCG's acquisition of Corbis' photo licensing business a "straw purchase." This is name-calling rather than credible argument.  Plaintiffs do not explain what they mean by "straw purchase," let alone cite evidence for it, nor do they explain what they believe the implications of that characterization are for their claims or for Getty Images' defenses.  In any event, Plaintiffs concede (as they must) that Getty Images "acquired the rights to license Corbis assets" through VCG.  Dkt. 130 at 5.

In sum, Plaintiffs fail to raise a genuine issue of material fact concerning the unbroken chain of license authority from the copyright owners of the photographs to Getty Images. Because Plaintiffs concede all of the material facts necessary to demonstrate that Getty Images' use of the photographs was licensed, their motion for partial summary judgment on their infringement claims should be denied, and Getty Images' motion for summary judgment dismissing Plaintiffs' infringement claims should be granted.

Plaintiffs fare no better with their effort to defeat Getty Images' other affirmative defenses. The undisputed record support for Getty Images' equitable estoppel defense is set forth in detail in Getty Images' own motion for summary judgment and is incorporated by reference here. While Plaintiffs baselessly accuse Getty Images of "hastily," "greedily," and "haphazardly" ingesting photographs from Corbis without due regard for rightsowners, Dkt. 130 at 1, 6, the uncontested record demonstrates the opposite: The ingestion of millions of photographic assets from Corbis (of which the NewSport collection was a tiny part) was the result of a meticulous process, developed through weeks of collaborative effort with Corbis, and it occurred only after the execution of new contributor agreements with the authorized licensors identified by Corbis. Getty Images did not know, and had no way of knowing, that Zuma had submitted photographs to Corbis under the NewSport contract, let alone that Zuma subsequently would assert rights in those photographs at odds with those conveyed to NewSport and Corbis. Plaintiffs' insistence that Getty Images did not rely to its detriment on Zuma's conduct because reasonable diligence by Getty Images would have revealed that the photographs belonged to Zuma is baseless. The Corbis metadata inherited by Getty Images indicated that NewSport, not Zuma, was the source of the photos, and the record confirms Zuma's relinquishment of exclusive license authority in the photographs (to the extent it had exclusive rights). The same core of

evidence concerning Zuma's conduct warrants denial of Plaintiffs' motion as to Getty Images' factually related defenses of acquiescence, waiver, and unclean hands.

Finally, in addition to their failure to identify any triable issue as to the claimed infringement by Getty Images, Plaintiffs have failed even to establish the prerequisite of copyright ownership for nearly one half of the photographs at issue.  Thus, at a minimum, Plaintiffs' motion for partial summary judgment should be denied as to each of the more than 20,000 works for which Plaintiffs cannot prove ownership.

## COUNTER-STATEMENT OF UNCONTROVERTED FACTS

Getty Images set forth the material facts concerning its use of Plaintiffs' works, its authorization to make such use, and its affirmative defense of equitable estoppel in the papers submitted in support of its own motion for summary judgment.  *See* Dkt. 81, Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Getty Images Mem.") at 10-25; Dkt. 83, Defendant Getty Images (US), Inc.'s Statement of Uncontested Material Facts Pursuant to Local Rule 56.1 in Support of Motion for Summary Judgment ("Getty Images Rule 56.1 Statement").  Getty Images incorporates those facts by reference here.  Below, Getty Images responds to a number of mischaracterizations, unproven assertions, and disproven assertions set forth by Plaintiffs as "Uncontroverted Facts" in their moving brief (*see* Dkt. 130 at 2-6).

**Plaintiffs' Failure To Establish Ownership of Nearly One Half of the Works Alleged To Be at Issue**

Plaintiffs state that Zuma has exclusive relationships with a number of photographers whose works are at issue in this case.  *See* Dkt. 130 at 2.  However, Zuma no longer claims to have nor provides evidence of an exclusive relationship with any of the following non-plaintiff photographers whose works are among the 47,048 at issue in this action:  KC Alfred, Jeff Aries, Armando Arorizo, Alan Ashley, Rex Atienza, Mark Avery, James Berglie, Anthony Bolante,

Larry Clouse, Cecil Copeland, Daren Fentiman, Brian Freed, Stan Godlewski, Al Golub, John Green, Braden Gunem, Romeo Guzman, Burt Harris, Ben Hicks, George Holland, Mark Holtzman, Robert Hughes, Ben Johnson, Scott Kelby, Dinno Kovic, C.J. LaFrance, Mike McGinnis, Bill McGuire, Richey Miller, Lou Novick, Brandon Parry, Andrew Patron, Albert Pena, Jason Pohuski, John Pyle, Gray Quetti, JC Ridley, Javier Rojas, Ruby Rubinstein, Ariana Ruiz, Chad Ryan, Joe Scarnici, Kirstin Scholtz, Alan Schwartz, Yuli Seperi, Kamal Sellehuddin, Andrew Shurtleff, Jordan Stead, Damon Tarver, Scott Terna, Josh Thompson, and Servais. Collectively, 13,592 of the 47,048 works alleged to be at issue are attributed to these photographers. *See* Declaration of Jonathan Bloom, dated July 20, 2018 ("Bloom Opp. Decl.") ¶ 10.

In addition, for four of the photographers identified by Plaintiffs as having exclusive relationships with Zuma—Sergei Bachalov, Brian Cahn, Mark Makela, and Mark Sobhani (*see* Dkt. 130 at 2)—Plaintiffs have failed to provide competent evidence of an exclusive license. For Sobhani, Plaintiffs have produced only an unsigned agreement. Dkt. 104-1 (Sobhani Decl.). For Bachalov, Cahn, and Makela, Plaintiffs have not provided any agreement at all.[1] Because exclusive licenses must be in writing *and* signed by the owner of the rights conveyed, *see* 17 U.S.C. § 204(a), Plaintiffs have not established ownership of the works by Bachalov, Cahn, Makela, or Sobhani. Collectively, 127 of the 47,048 works alleged to be at issue are attributed to these photographers. *See* Bloom Opp. Decl. ¶ 10.

Plaintiffs Tiyu Beijing Culture Media Co., Ltd. ("Osports") and Action Sports Photography, Inc. ("Action Sports") also have failed to prove their claimed ownership of

---

[1] Plaintiffs' Statement Pursuant to Local Rule 56.1 refers to Zuma's exclusive agreements with Bachalov, Cahn, and Makela, *see* Dkt. 131 (Plaintiffs' Statement Pursuant to Local Rule 56.1 ("Plaintiffs' Rule 56.1 Statement")) ¶¶ 65, 149, 223, but no such agreements were submitted in support of Plaintiffs' motion.

thousands of the works alleged to be at issue.  In support of Osports' ownership claims, Plaintiffs

have submitted a declaration from Liu Ying and what he states are translations of certain

photographers' work-for-hire agreements.  *See* Dkt. 138 (Ying Decl.) ¶¶ 5-12 & Exs. A-H.  Even

if the Plaintiffs had provided signed copies of these agreements, they would fail to establish that

Osports has a cognizable ownership interest in the works identified by Ying.  Ying explains that

the purpose of each agreement with the photographers was "to create photographs for the

purposes of licensing."  *Id.* ¶¶ 5-12.[2]  Although Plaintiffs characterize these agreements as

"work-for-hire" contracts, Dkt. 130 at 3, Ying's statement as to the purpose of the creation of the

photographs makes clear that they are not works made for hire under U.S. copyright law.  *See* 17

U.S.C. § 101(2) (defining "work made for hire" and listing specific categories of works created

by non-employees capable of being treated as works made for hire for purposes of copyright

ownership).  Because the photographs do not fall into any of the enumerated categories, Osports'

characterization of the agreements as "work-for-hire" contracts is not accurate, and Osports has,

accordingly, failed to establish ownership under U.S. copyright law of any of the 879 works

Plaintiffs attribute to Osports.

As for Action Sports, Plaintiffs state that Action Sports "owns its respective copyrights

by virtue of employment relationships with eight photographers," Dkt. 130 at 10, but Action

Sports has not established that any of its photographers (Stephen Arce, Walter Arce Sr., Ashley

Dickerson, Michael Dinovo, Jerome Hamilton, Stephen Houchen, Crystal MacLeod, and John F.

Moore), who together account for 7,450 of the photographs, *see* Bloom Opp. Decl. ¶ 10, are

---

[2] The Ying Declaration should be treated with skepticism in any event, as the version signed by
Ying differs from the version submitted to the Court without any explanation of the nature and
extent of the changes made following his execution of the signature page.  Compare Dkt. 138 at
8 (unsigned signature page referring to copying of Osports photos) *with id.* at 9 (executed
signature page referring to copying of Barham photos).

employees.  Plaintiffs filed declarations by these photographers attesting vaguely to an

employment relationship, but the handful of agreements between Action Sports and its

photographers that Plaintiffs produced in discovery indicate that they worked for Action Sports

as independent contractors, not as employees.  *See* Bloom Opp. Decl. Exs. B, C, D, & E

(agreements with Stephen Arce, Ashley Dickerson, Michael Dinovo, and Crystal Macleod, each

referring to the photographers as "contracted photographers" and setting payment on a "rate per

race" basis).

Furthermore, although Plaintiffs claim to have registered all of the photographs at issue in

this case with the U.S. Copyright Office, *see* Dkt. 130 at 3, the portions of their Local Rule 56.1

Statement and the Declaration of Richard Liebowitz, dated June 29, 2018, Dkt. 137 ("Liebowitz

Decl.") cited in support of this assertion relate to only the subset of the 47,048 photographs for

which Plaintiffs are attempting to establish ownership and not to the 13,592 works at issue as to

which Plaintiffs apparently have abandoned their claims.  *See* Dkt. 130 at 3 (citing Dkt. 131

(Plaintiffs Rule 56.1 Statement) and Dkt. 137 (Liebowitz Decl.)).  Moreover, for many thousands

of the remaining works, because Plaintiffs failed to register the copyrights within five years of

first publication, neither the copyrights nor the facts stated in the registration certificate are

entitled to a presumption of validity.  *See* 17 U.S.C. § 410(c).[3]

**Plaintiffs' Consent To License Their Photographs Through NewSport and Corbis**

Plaintiffs claim that it is "uncontested that Defendant did not have permission, consent,

nor any other kind of authorization from any of the Plaintiffs to copy, display, distribute, offer to

license and/or license any of the photographs at issue here."  Dkt. 130 at 4.  This is not true.  As

---

[3] Even for those registrations issued within five years of first publication, Getty Images is
entitled to rebut the ownership claims on grounds such as those identified above with respect to
the Bachalov, Cahn, Makela, Sobhani, Action Sports, and Osports photographs.  *See* Point III,
*infra*.

described in Getty Images' opening brief (Dkt. 81) and further herein, Plaintiffs licensed their

photographs to NewSport and Corbis on terms that resulted in Getty Images subsequently

lawfully acquiring rights in them.  *See* Dkt. 81 at 30-32; Dkt. 83 ¶¶ 19-21, 32-38, 47-48, 53-54;

*infra* pp. 16-21.

      The claimed lack of authorization is contradicted by Plaintiffs' concession that Zuma

"uploaded the photographs that are the subjects of this litigation via Newsport path (sic) to

Corbis' file-transfer protocol ('FTP') for distribution under the NewSport-Corbis agreement."

Dkt. 130 at 4-5.  Plaintiffs cannot dispute that as part of that initiative, Zuma's CEO Scott Mc

Kiernan signed an agreement with NewSport and Corbis (the Redirection Agreement) affirming

that "all images produced under the [NewSport-Corbis] Contract shall be personally created by

NewSport, or that NewSport *has the authority to grant all rights and licenses under the*

*Contract*."  Dkt. 111-25 (Bloom Decl. Ex. Y) (emphasis added).  Plaintiffs also cannot dispute

that the NewSport-Corbis contract included, *inter alia*, the rights and licenses to copy, display,

distribute, offer to license, and license each of the photographs submitted thereunder.  *See* Dkt.

111-6 (Bloom Decl. Ex. F) ¶ 2.  Moreover, the NewSport-Corbis contract gave Corbis the right

to assign the contract to VCG, *see id.* ¶ 13.2—a right Corbis exercised in January 2016.

      Plaintiffs concede that when Zuma "asked Corbis to remove the photographs submitted

via Newsport path (sic)," Corbis "informed Zuma that it needed permission from NewSport in

order to remove the photographs."  Dkt. 130 at 5.  But Plaintiffs omit the critical fact that Corbis

specifically insisted on *written* permission from NewSport to remove the photos because

NewSport, not Zuma, was the recognized rightsholder, as Corbis repeatedly told Zuma.  *See* Dkt.

81 at 13-15; Dkt. 83 ¶¶ 42-45.  Indeed, Corbis' acceptance of photographs that Zuma fed through

NewSport's FTP path was conditioned on the express warranties and representations as to

NewSport's license authority in the Redirection Agreement and in the NewSport-Corbis

Contract.  *See* Dkt. 111-25 (Bloom Decl. Ex. Y); Dkt. 111-6 (Bloom Decl. Ex. F); Dkt. 11-7

(Bloom Decl. Ex. G).

      Plaintiffs' contentions that Les Walker "requested that the Zuma photographs be removed

from Corbis" and "understood that the Zuma photographs were removed from Corbis," Dkt. 130

at 5, are not true.  The record shows that, at most, Walker discussed the prospect of separating

Zuma-fed photographs *from the rest of the NewSport collection*—not removal of those

photographs from Corbis—and it confirms that Walker never provided Corbis with the written

authorization for the separation that Corbis required.  Dkt. 81 at 16; *see also* Dkt. 96 (Walker

Decl.) ¶¶ 34-35 (testifying that he did not know if Corbis ever took any steps to remove Zuma-

fed images from the NewSport archive and that, after the termination of his relationship with

Zuma, he continued to license the NewSport collection through Corbis with royalties redirected

to his attention); Dkt. 111-5 (Bloom Decl. Ex. E (Walker Deposition)) 43:4-8 (same).

      Undisputed record evidence further shows that the Zuma-fed photographs were *not*

removed by Corbis from the NewSport collection.  Dkt. 81 at 17.  Seth Greenberg, who worked

for Corbis in 2011-12 and now works for Zuma, testified without contradiction that no written

permission was ever provided by NewSport and that, to his knowledge, the photos Zuma

submitted using the Newsport feed were never removed from the NewSport collection.  *See* Dkt.

81 at 16-17; Dkt. 83 ¶¶ 43, 45; Dkt. 111-1 (Bloom Decl. Ex. A) (Greenberg Deposition) 67:13-

23, 68:12-69:15, 69:16-70:7, 80:9-13, 83:20-22.  Zuma's CEO likewise admitted that he had no

knowledge of Corbis ever separating Zuma-fed photographs from the rest of the NewSport

collection.  Dkt 111-3 (Bloom Decl. Ex. C (Mc Kiernan Deposition)) 111:1-23.  Plaintiffs simply

cannot refute that, even as Corbis wound down its business in 2016, the photographs submitted

by Zuma remained associated by Corbis with NewSport, which is why they were migrated from Corbis to Getty Images following (i) the assignment of the NewSport-Corbis contract to VCG, (ii) the execution of the distribution agreement between VCG and Getty Images, and (iii) the execution of the Contributor Agreement between NewSport and Getty Images.  *See infra* p. 16.

## Getty Images' Acquisition of the Rights To License Corbis Assets, Including the NewSport Collection

In another admission fatal to their contention that Getty Images was not authorized to display and offer the photographs, Plaintiffs concede that Getty Images acquired the right to license Corbis assets via VCG.  *See* Dkt. 130 at 5.  Plaintiffs try to discredit this transaction by characterizing VCG's acquisition of the rights to license Corbis assets as a "straw purchase," *id.*, but if they mean to imply that Getty Images used VCG as a vehicle to acquire rights to Corbis assets it knew were somehow tainted, there is no support for that claim.

Moreover, as Getty Images showed in its motion for summary judgment, it did not rely solely on the assignment of rights from Corbis via VCG; it also entered into new contributor agreements with the authorized representatives of photographic collections it wished to migrate. *See* Dkt. 81 at 18-19.  Zuma asserts that in signing the Getty Images Contributor Agreement on behalf of NewSport, Les Walker "understood that only his own images would be subject to the agreement," Dkt. 130 at 5, but this is false.  Walker testified that "*NewSport* was offered the opportunity to migrate its content from Corbis to Getty Images and, *in my capacity as President of NewSport*, I was invited to sign a direct agreement with Getty Images concerning *that content*. Getty Images' offer was attractive [sic] me, and I entered into a contributor agreement with Getty Images *for the NewSport collection*."  Dkt. 96 (Walker Decl.) ¶¶ 37-38 (emphasis added); *see also* Dkt. 111-5 (Bloom Decl. Ex. E (Walker Deposition)) 47:16-25.  Walker's testimony that, at the time he signed the NewSport Contributor Agreement with Getty Images, the NewSport

collection "included more than 100,000 images and reflected the work of approximately 450 different photographers," Dkt. 96 (Walker Decl.) ¶ 41, further refutes Plaintiffs' assertion that the NewSport Contributor Agreement covered only Walker's own photographs.  Indeed, following the execution of the Contributor Agreement, Walker followed up with Getty Images multiple times to ensure that the *NewSport content* was set to migrate from Corbis to Getty Images.  *See* Dkt. 96 (Walker Decl.) ¶¶ 40-41; Dkt. 111-37 (Bloom Decl. Ex. KK) (Walker asking Getty Images to confirm that the "Newsport photo agency content is set to transfer"); Dkt. 81 at 19.  Walker even suggested that Getty Images "delete the Les Walker account" to resolve any confusion arising from his personal and NewSport accounts both being associated with the same email address.  *See* Dkt. 111-36 (Bloom Decl. Ex. JJ).  In short, Plaintiffs' suggestion that Walker meant only to license his personal photographs is wrong.

There also is no ambiguity as to whether Getty Images understood it was licensing the NewSport collection, rather than Les Walker's personal collection of photos.  Travis Lindquist, Getty Images' Vice President for Global Sports Editorial Content, testified that Getty Images sought to and did enter into a contributor agreement with NewSport and had no interest in licensing Walker's personal collection.  Dkt. 91 (Lindquist Decl.) ¶¶ 9-10.  Plaintiffs' observation that Les Walker's personal photography collection was on a "do not sign" list of collections previously licensed through Corbis, Dkt. 130 at 6, only confirms that the contributor agreement signed by Walker conveyed rights to the NewSport collection and not to his own photographs.

### Getty Images' Ingestion of Corbis Assets Following the Execution of New Contributor Agreements

In support of its motion for summary judgment, Getty Images explained the painstaking process Getty Images employed to migrate a massive amount of content from Corbis following

the execution of new contributor agreements.  *See* Dkt. 81 at 18-19; Dkt. 83 ¶¶ 55-56, 79-80;

Dkt. 89 (Kortegard Decl.).  The record evidence of the care with which Getty Images planned

and executed the migration, and of Corbis' identification of NewSport (not Zuma) as the source

of the photographs at issue, flatly contradicts Plaintiffs' claim that Getty Images "haphazardly"

ingested the NewSport collection "despite the obvious appearance of the photographs as

belonging to Zuma and not to NewSport or Les Walker."  Dkt. 130 at 6.

   Multiple witnesses testified that the migration of images from Corbis occurred "only after

Getty Images had entered into a new Contributor Agreement with the licensor of that content, as

identified in Corbis' records."  Dkt. 89 (Kortegard Decl.) ¶ 13; *see also* Dkt. 87 (Eisenberg

Decl.) ¶ 7 ("Once Corbis contributors signed a contract agreement with Getty Images, we created

mappings that linked their original Corbis contract ID to the new Getty Images contract(s) that

were set up for their new Getty Images contract agreement.").  Moreover, the migration followed

weeks of rigorous testing and systems development to ensure that only assets covered by new

contributor agreements were migrated.  *See* Dkt. 89 (Kortegard Decl.) ¶¶ 4-13; Dkt. 87

(Eisenberg Decl.) ¶¶ 7-9.

   The falsity of Plaintiffs' claim that Getty Images' ingestion of assets was "haphazard[]"

is further demonstrated by the fact that *not a single asset* migrated outside the parameters of the

system designed by Getty Images.  *See* Dkt. 89 (Kortegard Decl.) ¶ 13.[4]  Getty Images migrated

---

[4] Jamin Kortegard, a Getty Images Manager of Software Engineering, testified that "[t]he only allegation of any migration 'error' of which I am aware is the one made by the plaintiffs in this litigation.  Even with respect to the photographs at issue in this litigation, the application performed as intended:  It processed and migrated the metadata and images for each asset associated with Corbis contract 9995 only after Getty Images had entered into a new Contributor Agreement with the licensor of that content, as identified in Corbis's records."  Dkt. 89 (Kortegard Decl.) ¶ 13.  He further explained that Getty Images "had no way of knowing that Zuma Press had submitted photographs to Corbis under that contract ID, let alone that Zuma Press would dispute that the authorized representative identified in Corbis's records for those

some seven million images from Corbis, Dkt. 87 (Eisenberg Decl.) ¶ 4; Dkt. 89 (Kortegard

Decl.) ¶ 6, and this is the only dispute to arise in connection with that migration.  *See* Dkt. 89

(Kortegard Decl.) ¶ 13.  While Zuma claims to license a collection of more than 20,000,000

images and had its own distribution agreement with Corbis, *see* Dkt. 36 (Second Am. Compl.) ¶

25; Dkt. 111-14 (Bloom Decl. Ex. N), Zuma has no evidence that any photograph it claims to

own migrated from Corbis to Getty Images other than the photographs that it submitted for

distribution under the NewSport-Corbis contract.

Moreover, contrary to Plaintiffs' unsupported assertion, the appearance of "Zuma Press"

in the caption credit (but not in the source field) of the Corbis metadata associated with the

photographs did *not* make it "obvious" that they "belong[ed] to Zuma."  Dkt. 130 at 6.  The

Corbis metadata uniformly indicated that *NewSport*—not Zuma—was the source of the images,

*see* Dkt. 87 (Eisenberg Decl.) ¶ 12 (testifying that each photograph "reflect[ed] 'NewSport,'

rather than Zuma, as the source of the image" in metadata supplied by Corbis to Getty Images

and "reference[d] 'Zuma' only in the free-text caption field of the metadata and not in any of the

actual credit fields").  Getty Images' Director of Content Management, Chris Eisenberg,

explained that "[i]f a [Corbis] contributor had indicated that the attribution should differ from the

name of the source providing the image, Corbis' practice was to reflect this" in either the

"custom credit line" or "provider source" data fields, but neither of those fields was populated

for the photographs that Zuma submitted under the NewSport-Corbis contract.  Dkt. 87

(Eisenberg Decl.) ¶ 12.

The fact that "Zuma" did not appear where attribution information was expected to

appear in Corbis metadata refutes Plaintiffs' contention that Getty Images missed a "red flag"

---

photographs in fact was authorized to grant rights to all of the content associated by Corbis with
that contract number."  *Id.*  Plaintiffs have adduced no evidence challenging this testimony.

concerning Zuma's claimed rights.  Mr. Kortegard, who wrote the migration script, testified that

none of the thousands of Corbis assets tested by Getty Images or other data examined in

designing the migration contained an attribution in the Corbis caption field rather than in the

photographer name or agency fields, where it would have been expected to appear.  Dkt. 89

(Kortegard Decl.) ¶¶ 20-21, 24.

Even the notion that it was irresponsible (or worse) for Getty Images not to have

manually scrutinized each of the Photographs prior to the migration and not to have seen, and

identified possible infringement based on, "ZumaPress" in the caption of the photographs is

divorced from reality.  The scale of the Corbis migration made manual, work-by-work scrutiny

impossible.  *See* Dkt. 87 (Eisenberg Decl.) ¶ 8; Dkt. 89 (Kortegard Decl.) ¶ 6.  Getty Images

instead engaged in extensive testing of thousands of Corbis assets while designing an automated

process that would (and did) ensure a proper migration of assets and their metadata onto the

Getty Images system.  *See* Dkt. 81 at 26-27; Dkt. 83 ¶ 88; Dkt. 89 (Kortegard Decl.) ¶ 8, 20-21,

23-24.  The appearance of a reference to Zuma in the free-text caption field of metadata that

properly credited NewSport as the source of the photographs was hardly a "red flag" that Getty

Images failed to heed.[5]

## **ARGUMENT**

## I.     **GETTY IMAGES DID NOT COPY PLAINTIFFS' WORK WITHOUT AUTHORIZATION**

Plaintiffs' perfunctory argument that Getty Images copied their work without

authorization, Dkt. 130 at 12-13, has no merit for the reasons set forth in Getty Images'

---

[5] Mc Kiernan's testimony that it is "industry standard" to add the name of the licensing agency to the existing credit line, *see* Dkt. 111-3 (Bloom Decl. Ex. C) 86:16-24, 87:22-88:3, confirms the disingenuous nature of Plaintiffs' suggestion that references to multiple agencies was a red flag.

summary judgment papers.  *See* Dkt. 81 at 30-32.  Plaintiffs' claim that there is "no factual dispute concerning authorization" because Plaintiffs "never directly granted Getty authorization" to copy the photographs, Dkt. 130 at 13, is frivolous:  Getty Images *was* authorized to distribute and license the photographs, *see* Dkt. 81 at 30-32, and it is irrelevant that the authorization came through an authorized representative rather than directly from Plaintiffs.

Plaintiffs' admission that Zuma "uploaded the photographs that are the subjects of this litigation [to Corbis] . . . for distribution under the NewSport-Corbis agreement," Dkt. 130 at 4-5, is dispositive as to their infringement claims because it is undisputed that the NewSport-Corbis agreement: (i) contained broad warranties as to NewSport's rights to license the photographs thereunder; (ii) made clear that no separate permission from Zuma or anyone else was required for Corbis to display, license, and distribute the photographs; and (iii) was assignable by Corbis without further consent.  *See* Dkt. 81 at 14.

Corbis exercised its right to assign the NewSport contract when it sold its image licensing business to VCG, which, in turn, granted Getty Images an exclusive license to distribute worldwide (except in China) all content that VCG owned or had the right to license, including that obtained from Corbis.  *See* Dkt. 111-19 (Bloom Decl. Ex. S) § 2.1; Dkt. 81 at 17-18; *see also* Dkt. 130 at 5 (Plaintiffs conceding that Getty Images acquired the rights to Corbis content). The VCG-Getty Images agreement not only granted Getty Images rights to the photographs at issue here but also expressly contemplated that Getty Images would enter into separate licenses with Corbis contributors.  Dkt. 111-19 (Bloom Decl. Ex. S) § 2.1.  Getty Images did so with NewSport in April 2016 by entering into a contributor agreement that granted Getty Images exclusive rights in the entire NewSport collection, including all of the photographs at issue in this case.  *See* Dkt. 111-20 (Bloom Decl. Ex. T).

There is no support for the proposition that the foregoing did not constitute valid authorization because Getty Images was not authorized "directly" by the copyright owners. The very business of photo licensing agencies such as NewSport, Zuma, Corbis, and Getty Images is to act as an authorized representative of copyright owners. The business model is built around sublicensing, i.e., indirect authorization by copyright owners. Agencies often acquire rights not from the copyright owner but, as Getty Images' contributor agreement contemplates, from "the authorized representative of the applicable copyright owner(s)," Dkt. 111-20 (Bloom Decl. Ex. T) § 2.1, and they routinely grant licenses to subagents and end users without the direct involvement of the copyright owner. For example, the NewSport-Corbis contract granted Corbis the right to license Accepted Images directly or through "affiliates, partners, agents, customers, and their end-users," Dkt. 111-6 (Bloom Decl. Ex. F) § 2, and the NewSport's Contributor Agreement gave Getty Images the right to "sublicense or authorize any third party distributors" to exercise the rights granted to Getty Images. Dkt. 111-20 (Bloom Decl. Ex. T) § 1.1.

Zuma's own business, no differently, involves sublicensing through other agencies, and its agreements with photographers expressly authorize Zuma's subagents to engage in the same activities as Zuma itself. *See, e.g.*, Dkt. 77-1 ¶ 1. Zuma's CEO, Scott Mc Kiernan, acknowledged that no additional permissions are needed from Zuma's contributors when Zuma authorizes third parties to license their works, and he testified specifically with respect to the photographs at issue that Zuma neither obtained nor needed to obtain the consent of the photographers when it submitted the photographs to Corbis under the NewSport-Corbis contract rather than under Zuma's own contract. *See* Bloom Opp. Decl. Ex. A (Mc Kiernan Deposition)) 76:16-19 ("Q: ZUMA Press did not need permission from its contributors to submit their photographs to Corbis under the Newsport contract, did it? A: No."); *see also id.* at 76:23-77:2

17

(acknowledging use of subagents).  The declarations of Zuma's purported exclusive-licensee photographers and the representation agreements appended thereto confirm that Zuma: (i) had the right to authorize third parties to reproduce, distribute, and display their works; (ii) had the right to authorize subagents to license, market, distribute, display, and transmit their works; and (iii) was not required to seek special permission from the photographers to exploit their photographs.  *See* Dkt. 73-122 ¶¶ 6-7; *see also, e.g.*, Dkt. 77-1 ¶ 1.  In short, the lack of "direct" authorization by Plaintiffs to Getty Images is not material.

Even less credible is Plaintiffs' peculiar alternative argument that there is no evidence that they *indirectly* authorized Getty Images because there was "never any communication between Plaintiffs and Getty prior to Getty's display of the Photographs."  Dkt. 130 at 13.  In addition to conflating direct and indirect authorization (by suggesting that indirect authorization requires direct communication between the parties), this argument flies in the face of the fact that, as explained, Plaintiffs *did* indirectly authorize Getty Images' use of the photographs. Communication between Plaintiffs and Getty Images was not necessary *because NewSport was an authorized representative* of the photographs Zuma submitted to Corbis under the NewSport contract, as expressly affirmed in the Redirection Agreement signed by Mc Kiernan on Zuma's behalf.  *See* Dkt. 111-25 (Bloom Decl. Ex. Y).  As noted, the NewSport-Corbis contract gave Corbis the right to display, license, sub-license, and distribute the photographs submitted thereunder as well as the right to assign the contract (as Corbis later did in its transaction with VCG) without further consent.  *See* Dkt. 81 at 14.

Plaintiffs also cite no support for their claim that "[n]either Les Walker, NewSport nor Corbis had the right to authorize the transfer" of the photographs to Getty Images, Dkt. 130 at 6, and it is not true.  As discussed, in the Redirection Agreement Zuma expressly authorized

NewSport and Corbis to license those works on its behalf pursuant to the NewSport-Corbis contract.

Plaintiffs' related claim that Getty Images "has not produced a license that covers the photographs at issue here," Dkt. 130 at 15, is also untrue.  Getty Images produced both the distribution agreement with VCG, which conveyed a broad license to the rights assigned by Corbis to VCG, and the NewSport Contributor Agreement, which covered the entire NewSport collection, including the photographs at issue.  *See* Dkt. 81 at 17-19.  The NewSport Contributor Agreement granted Getty Images exclusive worldwide rights to "any Accepted Content," defined in the preamble as "all Content that you have previously submitted and, in the future, will submit that is accepted for distribution by Getty Images."  Dkt. 111-20 (Bloom Decl. Ex. T) at GETT00051389.  There is no dispute that Walker intended for the NewSport content previously available through Corbis to transition to Getty Images and that each of the photographs was migrated to Getty Images pursuant to that grant of rights because they were associated by Corbis with NewSport.  *See* Dkt. 96 (Walker Decl.) ¶¶ 37-41; Dkt. 87 (Eisenberg Decl.) ¶ 12.

Plaintiffs are left to contend that Walker "did not intend to convey rights to photographs that were not his own," Dkt. 130 at 15, but that is not the case.  As stated above, Walker testified unequivocally that he intended to grant Getty Images rights in the NewSport collection, which consisted primarily not of his own photographs but of photographs shot by other photographers.  *See* Dkt. 96 (Walker Decl.) ¶¶ 37-41; *see also* Dkt. 98 (Wojtczak Decl.) ¶ 13; *supra* pp. 11-12.  Plaintiffs' further contention that Walker "did not even contemplate that Zuma's photographs were still part of his collection when he signed the Contributor Agreement," Dkt. 130 at 15, has no bearing, even if true, on Getty Images' rights to those photographs.  As a threshold matter, unless NewSport was an authorized licensor of the photographs, Plaintiffs would not even have

standing to challenge the scope of the NewSport Contributor Agreement because none of them is

a party to it. *See, e.g.*, *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 87 (2d Cir. 2014)

(holding that plaintiffs lacked standing to challenge assignment of their mortgage loans where

they were not parties to the assignment agreements or intended beneficiaries); *Friedus v.*

*Sardelli*, 192 A.D.2d 578, 580 (2d Dep't 1993) (joint venture lacked standing to reform, rescind,

or have performed contracts to which it was not a party or privy).[6]

If Plaintiffs do have standing to contest the rights conveyed to Getty Images by

NewSport, then any purported misapprehension by Walker as to the precise contents of the

NewSport collection is not a ground on which to retroactively narrow the rights NewSport

conveyed to Getty Images.[7]  The Contributor Agreement authorized the migration of the entire

NewSport collection, and NewSport bore the risk that the collection contained photographs to

which it did not have rights (or intended to but forgot to withhold), as reflected in NewSport's

indemnification of Getty Images against liability arising from breach of NewSport's

representations and warranties.  *See* Dkt. 111-20 (Bloom Decl. Ex. T) §§ 2.1, 2.2.  NewSport's

express assumption of the risk of a mistake clearly precludes rescinding its conveyance of rights

in the photographs on that ground—which would have been improper even without the

indemnification.  *See, e.g., Wilson v. Clark*, No. 84 Civ. 5076 (LBS), 1986 WL 354, *3

(S.D.N.Y. May 1, 1986) ("With respect to any matter not made a basic assumption of the

---

[6] Plaintiffs cannot be third-party beneficiaries of the NewSport-Getty Images Contributor
Agreement if, as they assert (*see* Dkt. 130 at 15), Walker did not know that the Zuma-associated
photographs were part of the NewSport collection when he signed the agreement.  *See Mendel v.*
*Henry Phipps Plaza W., Inc.*, 6 N.Y.3d 783, 786 (2006) (party asserting third-party beneficiary
rights under a contract must establish, *inter alia*, that the contract was intended for its benefit).

[7] It is also inconsistent with Walker's assertions of rights to the content in question when
contacted by Getty Images in 2016.  *See* Dkt. 98 (Wojtczak Decl.) ¶ 13; *see also* Dkt. 111-43
(Bloom Decl. Ex. QQ) (reporting Walker's statement that he "retained rights to NewSport
content" after his relationship with Zuma ended).

contract, the parties take their chances."); *Estate of Nelson v. Rice*, 198 Ariz. 563, 567 (Ct. App. 2000) (holding that mistake did not allow estate to rescind sale of unrecognized valuable paintings where estate "had ample opportunity to discover what it was selling and failed to do so" such that allocating burden of mistake to estate was reasonable).

*     *     *

Given Plaintiffs' failure to raise a genuine issue of material fact as to whether Getty Images acquired a license to the photographs at issue as part of the NewSport collection, the Court should deny Plaintiffs' motion for partial summary judgment on their infringement claims and on Getty Images' license defense. For the same reason, Getty Images' motion for summary judgment on those same issues should be granted.

## II.   PLAINTIFFS' CANNOT OVERCOME GETTY IMAGES' AFFIRMATIVE DEFENSES OF EQUITABLE ESTOPPEL, ACQUIESCENCE, WAIVER, AND UNCLEAN HANDS

If—as it should—the Court finds that Getty Images' use of the photographs at issue was authorized (and thus not infringing), it need not reach Getty Images' other affirmative defenses. If the Court does reach them, it should find that Zuma's submission of the photographs at issue under the NewSport-Corbis contract in order to benefit from the higher royalty rate in that agreement; the resulting authorized intermingling of those photographs with the NewSport collection; Zuma's failure to disentangle the photographs from the NewSport collection; and Zuma's failure to disclose any of the foregoing to Getty Images prior to the migration warrant equitably estopping Plaintiffs from arguing that Getty Images' use was not authorized. *See* Dkt. 81 at 32-35. At a minimum, these undisputed facts require denying Plaintiffs' motion for partial summary judgment as to Getty Images' equitable estoppel, acquiescence, waiver, and unclean hands defenses.

A.       **Equitable Estoppel**

Getty Images explained at length in its summary judgment brief why Plaintiffs are equitably estopped from asserting infringement claims against Getty Images, *see* Dkt. 81 at 32-35, and it incorporates that discussion herein by reference.  What follows is limited to responding to arguments made by Plaintiffs in their opening brief.

Plaintiffs note that estoppel is a "drastic remedy" that "must be utilized sparingly," Dkt. 130 at 19 (quoting *Keane Dealer Serv., Inc. v. Harts*, 968 F. Supp. 944, 948 (S.D.N.Y. 1997)), but its application clearly would be appropriate here, as it was in *Keane*, to avoid rewarding Zuma (and the other Plaintiffs, who are in privity with Zuma) with a finding of infringement in view of Zuma's responsibility for causing the claimed infringement and its failure to disclose to Getty Images the relevant facts concerning its conduct.  Enforcement of Plaintiffs' copyrights against Getty Images in these circumstances "would work an injustice upon [Getty Images] due to [Getty Images'] justifiable reliance upon [Zuma's] words or conduct."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) (cited in Dkt. 130 at 19).

The record evidence demonstrates conclusively that Zuma's submission of photographs under the NewSport-Corbis contract, rather than under Zuma's own Corbis contract, was the precipitating cause of the claimed infringement (i.e., of the ingestion of the photographs at issue by Getty Images).  Dkt. 89 (Kortegard Decl.) ¶ 13; Dkt. 87 (Eisenberg Decl.) ¶¶ 12-15; Dkt. 81 at 19 n.4.  This is confirmed by the fact that the *only* photos that Zuma claims to represent that migrated from Corbis to Getty Images were those submitted under the NewSport-Corbis contract notwithstanding Zuma's allegation that it licenses a collection of some 20,000,000 images.  *See* Dkt. 87 (Eisenberg Decl.) ¶ 12 (stating that "all of the images appeared to . . . link back to Corbis Contract number 9995"); Dkt. 36 (Second Am. Compl.) ¶ 25.

There is no record support for Plaintiffs' attempt to sever this causal link, and to raise a factual issue as to Getty Images' detrimental reliance on Zuma's conduct, by asserting that "[r]easonable diligence" by Getty Images "would have revealed that LesWalker/NewSport (sic) was on its own DO NO SIGN list, that he did not own the images in question, and that the images belonged to Zuma." Dkt. 130 at 20. This jumble of false and immaterial assertions does not withstand scrutiny.

*First*, as described in detail in Getty Images' summary judgment brief, Getty Images acted diligently and in good faith every step of the way, from its handling of the migration from Corbis to the investigation of and response to Zuma's claims. *See* Dkt. 81 at 18-24.

*Second*, as explained above, there is a distinction (which Plaintiffs try to elide) between Les Walker as a photographer, on the one hand, and NewSport, the agency Walker ran, on the other. Getty Images entered into a contributor agreement with the latter and not with the former. *Specifically*, Les Walker as a photographer was given a "do not sign" designation by Getty Images when it assessed Corbis' collections based on the perceived value of his portfolio, *see* Dkt. 137-152 (Lindquist Deposition) 68:17-70:23, and Getty Images, accordingly, *did not sign him*. NewSport, by contrast, was given a "sign" designation, and Getty Images entered into a Contributor Agreement with NewSport. *See* Dkt. 91 (Lindquist Decl.) ¶¶ 9-10; Dkt. 96 (Walker Decl.) ¶¶ 37-41. The "do not sign" list, moreover, was nothing nefarious; it simply reflected Getty Images' evaluation of which collections formerly available through Corbis it wished to license and which it did not. *See* Dkt. 93 (Mailliet Decl.) ¶ 5; Dkt. 91 (Lindquist Decl.) ¶ 7. There is no factual basis for Plaintiffs' clumsy attempt to suggest that Getty Images somehow violated its own procedures, or turned a blind eye to potential infringement, by entering into an

agreement, signed by Les Walker as NewSport's authorized representative, for rights to the NewSport archive.

*Third*, Plaintiffs identify nothing that reasonably put Getty Images on notice that NewSport did not have rights to the photographs.  The notion that references to "ZumaPress" in the free-text caption fields of the photographs' metadata should have put Getty Images on notice that the images "belonged to Zuma," Dkt. 130 at 20, is unfounded for all the reasons explained by Jamin Kortegard, a Getty Images Manager of Software Engineering, and Chris Eisenberg, Getty Images' Director of Content Management, in their declarations in support of Getty Images' motion for summary judgment and as summarized in the Counter-Statement of Uncontroverted Facts above.  *See supra* pp. 14-15; Dkt. 89 (Kortegard Decl.) ¶ 20; Dkt. 87 (Eisenberg Decl.) ¶¶ 15-16.  Their testimony makes clear that there was no reason to expect the anomalous placement of a reference to Zuma in the caption field of the Corbis metadata; no reason to question the credit fields in the Corbis metadata that identified NewSport (correctly) as the source of the photographs; and no reason to have been surprised or alarmed by the appearance of more than one agency in the metadata even if Getty Images had been able to review the metadata manually on an image-by-image basis (which, as noted, was impracticable).  Dkt. 89 (Kortegard Decl.) ¶ 13, 23-25; Dkt. 87 (Eisenberg Decl.) ¶¶ 6-8, 15-16.

*Fourth*, Getty Images' reliance on the written assurance from NewSport in its Contributor Agreement that it was "the sole and exclusive owner of the Content submitted to Getty Images or . . . the authorized representative of the applicable copyright owner(s) of such Content," Dkt. 111-20 (Bloom Decl. Ex. T) § 2.1, was in accord with what Zuma has acknowledged to be its own practice.  *See* Dkt. 111-4 (Bloom Decl. Ex. D (Stewart Deposition)) 112:23-25 ("Q: [I]s it Zuma's practice to rely on these representations from its photographers?  A:  Yes."); Dkt. 111-3

(Bloom Decl. Ex. C (Mc Kiernan Deposition)) 150:8-13 ("Q: And you had relied on Cal Sport Media and its representation that it had the rights to the images it was supplying to ZUMA Press; right? . . . A:  Correct.  I believe so.  Yes, that sounds right."); *id.* 168:25-169:3 ("Q: What do you do to make sure that they actually own the copyrights to their images?  A:  Make them sign this contract that says that they agree that they do.").

There is, in the end, not a shred of credible support for the claim that Getty Images missed any "red flags" (Dkt. 130 at 1) indicating Zuma's claimed rights in the photographs.  To the contrary, in designing the migration Getty Images took pains to

> ensure[] that the [migration] application reacted to certain "red flags" within the Corbis data by erroring out rather than publishing—for example, if a Corbis flag indicated that an asset was restricted from being sold in a specified territory, we ensured the application set it aside for manual inspection.  We fixed the code as necessary until the correct data landed in the correct place every single time during the tests and never sent "bad" data downstream.

Dkt. 89 (Kortegard Decl.) ¶ 10.

Overall, the record establishes beyond dispute that Getty Images did everything that reasonably could have been expected to ensure that it obtained legal rights to the Corbis assets it decided to license, including the NewSport collection, and that the Corbis content was accurately migrated to the Getty Images system after the necessary rights were in place.  If there was infringement involved in Getty Images' ingestion of the Photographs—and, as explained in Point I above, there was not—it was caused by Zuma's exploitation of the NewSport-Corbis contract, not by any knowing, reckless, or even negligent conduct by Getty Images.

For all these reasons, Plaintiffs' motion for partial summary judgment on Getty Images' equitable estoppel defense must be denied, and Getty Images' motion for summary judgment should be granted.

**B.      Acquiescence, Waiver, and Unclean Hands**

The same core of facts that supports Getty Images' equitable estoppel defense also supports Getty Images' related defenses of acquiescence, waiver, and unclean hands.  To the extent directed to these defenses, Plaintiffs' motion for partial summary judgment should be denied.

### *1.      Acquiescence*

Plaintiffs acknowledge that "acquiescence in the defendant's infringing acts" may, if "continued for a sufficient period of time and if manifested by overt acts," result in "an abandonment of copyright." Dkt. 130 at 14 (citations omitted).  They contend, however, that "[a]t no point in time have any of the Plaintiffs acquiesced to the Defendant's infringement," *id.* at 14, but they misapprehend the basis for Getty Images' acquiescence defense.  Zuma (acting on its own behalf and that of the other Plaintiffs) not only acquiesced in but affirmatively *caused* the conveyance of rights to NewSport, by which Zuma voluntarily gave up the legal right to control the licensing of the photographs it submitted under the NewSport-Corbis contract.  *See supra* p. 9.  Plaintiffs then acquiesced *for years* in Corbis' licensing of those photographs as part of the NewSport collection and its publication of those photographs on Corbis' website with a credit to NewSport as the source of the images.  *See supra* p. 10; Dkt. 111-52 (Bloom Decl. Ex. ZZ).

Zuma's "attempts to remove the images from Corbis's website," Dkt. 130 at 15, were, as noted, unsuccessful and therefore did not nullify Zuma's prior acquiescence in the licensing of the photographs by NewSport to Corbis under the NewSport-Corbis contract.  *See* Dkt. 111-25 (Bloom Decl. Ex. Y).  Accordingly, Plaintiffs are not entitled to summary judgment on Getty Images' acquiescence defense.  *See Affiliated Records, Inc. v. Taylor*, No. 09 Civ. 9938(KBF), 2012 WL 1675589 (S.D.N.Y. May 14, 2012) (holding that plaintiff's failure to send cease-and-

desist letters upon hearing songs at issue on the Internet established acquiescence to free distribution, warranting summary judgment on copyright infringement claims).

>            2.      *Waiver*

As Plaintiffs acknowledge, waiver is the "voluntary or intentional relinquishment of a known right, or intentional conduct inconsistent with claiming such a right." Dkt. 130 at 18 (citations omitted). Plaintiffs assert that Getty Images "fails to produce any evidence of a voluntary or intentional relinquishment of a known right or any intentional conduct to the contrary of its exercise," *id.* at 18, but this is obviously wrong. There is no dispute that Zuma (on behalf of itself and the other Plaintiffs) intentionally relinquished the exclusive right to license the photographs at issue by submitting them to Corbis for further licensing under the NewSport-Corbis contract. *See supra* p. 9. By designating NewSport as the authorized licensor of the photographs (in order to benefit from the higher royalty rate NewSport had secured from Corbis), Zuma waived its right to claim that NewSport was not, in fact, the authorized licensor of those same photos when Corbis assigned the NewSport-Corbis contract to VCG and when NewSport entered into a contributor agreement with Getty Images to migrate the NewSport collection from Corbis to Getty Images.

Because Zuma intentionally relinquished rights in the photographs to NewSport and Corbis, it waived the right to maintain infringement claims against Getty Images for those photographs after Getty Images was licensed via those entities. *See Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015) ("[A] copyright owner who grants an exclusive or nonexclusive license to use a work waives any right to assert an infringement claim against the licensee, or anyone whom the licensee is entitled to sublicense, for acts within the scope of the license or sublicense."). Accordingly, Plaintiffs' motion for partial summary judgment on Getty Images' waiver defense must be denied.

### 3.   *Unclean Hands*

For the reasons discussed in Point I above, Zuma's submission of photographs under the NewSport-Corbis contract gave NewSport and Corbis the authority to license those works.  If the Court were to find that Zuma's conduct did not give rise to a transfer of license authority to Getty Images, then its pursuit of relief here should be foreclosed under the doctrine of unclean hands.

As Plaintiffs acknowledge, the defense of unclean hands is available against a party "who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." Dkt. 130 at 20 (citation omitted).  If Plaintiffs' theory that NewSport (and in turn Corbis) did not have the authority to license the photographs were correct, then Plaintiffs' bald proclamation that "there is no evidence that Plaintiffs have committed any transgression at all," *id.* 130 at 21, would be wrong.  It is undisputed that Zuma used NewSport's FTP path and submitted photographs under the NewSport-Corbis contract in order to benefit from the higher royalty rate NewSport had at the time.  *See* Dkt. 83 at ¶¶ 26-38.  In order to receive royalties directly from Corbis for its licensing of those photographs to third parties, Zuma was required to sign an agreement with NewSport and Corbis affirming that for "all images produced under the [NewSport-Corbis contract] shall be personally created by NewSport or that NewSport has the right to grant all rights and licenses under [that contract]."  Dkt. 111-25 (Bloom Decl. Ex. Y) (Redirection Agreement).

If NewSport did *not* have the authority to grant all rights and licenses to the photographs that Zuma submitted under the NewSport-Corbis contract—as Zuma contended in its pre-litigation outreach to Getty Images[8]—there can be little doubt that Zuma acted fraudulently and

---

[8] *See* Bloom Decl. Ex. NN (email from Ruaridh Stewart claiming that NewSport "never had rights to distribute [Zuma's] images").

by deceit and unfair means in order to garner higher royalty payments from Corbis than it was

entitled to receive under its own contract.  There would, at a minimum, be a genuine issue of

material fact as to whether Zuma acted with the requisite intent.  Moreover, because Zuma's

exploitation of the NewSport-Corbis contract ultimately led to the (innocent) acquisition of the

NewSport collection by Getty Images that gave rise to this lawsuit, the record strongly supports

the conclusion that the deceitful conduct by Zuma "relates directly to the subject matter of the

infringement action."  Dkt. 130 at 20 (quoting *Broad. Music, Inc. v. Hearst/ABC Viacom Entm't

Servs.*, 746 F.  Supp. 320, 329 (S.D.N.Y. 1990)).

   Plaintiffs separate contention that, to the extent that Plaintiffs seek legal relief, the

doctrine of unclean hands is not applicable is not correct.  While there is authority in this Circuit

for the proposition that unclean hands is an equitable defense to equitable claims and does not

apply to legal relief, the bar is not absolute.  Courts in this District and elsewhere have

recognized that unclean hands may bar all forms of relief, particularly with respect to intellectual

property enforcement.  *See, e.g., Worldwide Home Prods, Inc. v. Bed Bath & Beyond, Inc.*, No.

11 Civ. 03633(LTS)(MHD), 2013 WL 247839, at *1-2 (S.D.N.Y. Jan. 22, 2013) (rejecting as

"meritless" plaintiff's contention that unclean hands was unavailable in patent infringement suit

for damages); *Dynamic Sols., Inc. v. Planning & Control, Inc.*, 646 F. Supp. 1329, 1342

(S.D.N.Y. 1986) (noting that unclean hands "has occasionally been held to bar [enforcement] of

a valid copyright"); *see also Societe Civile Succession Richard Guino v. Beseder Inc.*, No. CV

03-1310-PHX-MHM, 2006 WL 2917349, at *5 (D. Ariz. Oct. 6, 2006) ("unclean hands applies

in copyright infringement cases to prevent a plaintiff from obtaining relief both in law and in

equity"); *McCormick v. Cohn*, No. CV 90-0323, 1992 WL 687291, at *4 (S.D. Cal. July 31,

1992) (barring recovery of damages for copyright infringement based on unclean hands), *aff'd,*

17 F.3d 395 (9th Cir. 1994) (unpublished table decision).[9]  In any event, Plaintiffs seek both

equitable and legal relief and, even by their own lights, unclean hands would bar the latter.[10]

Accordingly, Plaintiffs' motion for partial summary judgment on Getty Images' unclean

hands defense must be denied.

### III.     PLAINTIFFS CANNOT PROVE COPYRIGHT OWNERSHIP FOR NEARLY ONE HALF OF THE 47,048 PHOTOGRAPHS ALLEGED TO BE AT ISSUE

In addition to their failure to raise a genuine issue of material fact as to infringement,

Plaintiffs have (contrary to statements in their motion papers) failed even to meet the preliminary

hurdle of establishing copyright ownership in—and thus standing to sue for infringement of—

nearly one half of the 47,048 photographs alleged to be at issue.  Plaintiffs acknowledge that

proof of ownership is required to establish an infringement claim.  *See* Dkt. 130 at 7 (citing *Feist*

*Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991), and *Castle Rock Entm't, Inc. v.*

*Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).  As explained below, however, they

have failed to make this showing as to more than 20,000 of the photographs at issue.

Accordingly, Getty Images—not Plaintiffs—is entitled to judgment as a matter of law on

Plaintiffs' infringement claims as to those works.

---

[9] Leading commentators agree that unclean hands is available as a complete defense to copyright infringement.  *See* 5 William F. Patry, PATRY ON COPYRIGHT § 17:127, Westlaw (updated Mar. 2018) ("Where unclean hands is established, it is a complete defense to the infringement action and any future actions until the unclean hands conduct is cured."); 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT §13.09[B] (Matthew Bender, rev. ed.) ("This equitable defense has been held available in a copyright infringement action regardless of whether the action is one at law or in equity.").

[10] Plaintiffs' requests for disgorgement of alleged profits, an accounting, and for attorneys' fees (on their section 1202 claim) seek equitable, not legal, relief.  *See, e.g.*, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 n.1 (2014) (profits).

### A.    Plaintiffs Have Abandoned Their Infringement Claims as to 13,592 Works

Zuma contends that its representation agreements give it exclusive rights in the covered photographs that confer standing to sue for infringement of the photographs covered by those agreements.  Dkt. 130 at 8.  Plaintiffs' brief lists the photographers with whom Zuma purports to have exclusive relationships.  *Id.* at 2.  Notably, this list leaves out many photographers as to whose works neither Zuma nor any other Plaintiff claims copyright ownership.  *See supra* pp. 5-6; Bloom Opp. Decl. ¶ 9.  These photographers' works total 13,592 of the 47,048 at issue.  Bloom Opp. Decl. ¶ 10.  Given the complete failure of proof as to these works, Plaintiffs' motion for summary judgment must be denied, and Getty Images' motion granted, as to these works.  *See, e.g.*, *Int'l Media Films, Inc. v. Lucas Entm't, Inc.*, 703 F. Supp. 2d 456, 466 (S.D.N.Y 2010) (granting summary judgment based on failure to prove copyright ownership).

### B.    Plaintiffs Do Not Have an Ownership Interest in Photographs by Bachalov, Cahn, Makela, or Sobhani

For a number of additional works, Plaintiffs attempt unsuccessfully to establish standing with declarations attesting to an exclusive license relationship between Zuma and certain photographers without providing evidence of signed, written license agreements.  Dkt. 130 at 7-9.  Specifically, they fail to provide competent evidence of exclusive licenses between Zuma and photographers Bachalov, Cahn, Makela, or Sobhani.  *See supra* p. 6.  For Bachalov, Cahn, and Makela, Plaintiffs rely solely on Mc Kiernan's assertion that there is an exclusive relationship.[11] For Sobhani, Plaintiffs rely on declarations from Mc Kiernan and Sobhani and an unsigned

---

[11] As noted above, Plaintiffs' Rule 56.1 Statement refers to exclusive agreements between Zuma and Cahn, Bachalov, and Makela, but no declarations or agreements were provided for these photographers.

license agreement.[12]  These proffers do not suffice.  Under section 204(a) of the Copyright Act, a transfer of copyright ownership—which is defined in section 101 of the Act, 17 U.S.C. § 101, to include an exclusive license—is "not valid unless an instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed[.]"  17 U.S.C. § 204(a). Because Zuma has not provided signed exclusive license agreements with Bachalov, Cahn, Makela, or Sobhani, it has not established a valid ownership interest in their works, and Plaintiffs' claims based on these works therefore fail.  *See Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 338 (S.D.N.Y. 2009) ("the transfer of an exclusive license, including a license for distribution of a copyrighted work, must be effected through a signed writing from the copyright owner or its agent").

C.    **Plaintiffs Have Not Established an Ownership Interest in the 879 Photographs Licensed Through Osports or CSPA**

879 of the photographs placed at issue by Plaintiffs are attributed to either Osports or to CSPA, an entity owned by Osports.  *See* Bloom Opp. Decl. Ex. F (Plaintiffs' Responses and Objections to Getty Images' Second Set of Interrogatories)).  To support Osports' claim to own these photographs, Plaintiffs rely on the Ying Declaration and unsigned translations of certain agreements between Osports and photographers that are claimed to be "work-for-hire contracts." Dkt. 130 at 10; *see also* Dkt. 138 (Ying Decl.) ¶¶ 5-12 & Exs. A-H.  Even if Plaintiffs had provided signed copies of these agreements, they would fail to establish that Osports has a cognizable ownership interest in the works identified by Ying.

In his declaration, Ying testifies that the purpose of each "work-for-hire agreement" with the photographers was "to create photographs for the purposes of licensing."  Dkt. 138 (Ying

---

[12]  Sobhani attested that the unsigned agreement is a "true and correct" copy of his agreement, Dkt. 104 (Sobhani Decl.) ¶ 5, but there is no testimony suggesting the agreement was ever signed as required by section 204(a).

Decl.) ¶¶ 5-12.  This testimony confirms that the photographs Osports claims to own are not

"works made for hire" under U.S. copyright law.  A work made for hire, as defined in section

101 of the Copyright Act, either must be "prepared by an employee within the scope of his or her

employment"—which Plaintiffs do not claim is true of the Osports photographers—or the works

must be "specially ordered or commissioned for use" within one of the following categories:  "as

a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a

translation, as a supplementary work, as a compilation, as an instructional text, as a test, as

answer material for a test, or as an atlas."  17 U.S.C. § 101 (definition of "work made for hire").

Because "photographs created for licensing" do not fall within any of the nine statutory

categories for specially ordered or commissioned works, they are not "works made for hire" as a

matter of law notwithstanding a written agreement describing them as such.  *See Richard J. Zitz,*

*Inc. v. Pereira*, 225 F.3d 646 (2d Cir. 2000) (table, text at 2000 WL 1239830, at *4) (work for

hire provision of Copyright Act inapplicable where "drafting of architectural blueprints [did] not

fit into any of the . . . nine categories of 'specially ordered' work"); *Christians of Cal., Inc. v.*

*Clive Christian N.Y., LLP*, No. 13-CV-275 KBF, 2014 WL 4743422, at *3 (S.D.N.Y. Sept. 15,

2014) (plans for cabinetry and furniture not a "work made for hire" because they did not fit

within any of the statutorily enumerated categories).  Accordingly, Plaintiffs have failed to

establish that Osports has an ownership interest cognizable under U.S. copyright law in any of

the 879 works Plaintiffs attribute to it.

### D.   Plaintiffs Have Not Established an Ownership Interest in the 7,450 Photographs Licensed Through Action Sports

Action Sports, like Osports, claims to own certain photographs under the work-for-hire

doctrine.  Dkt. 130 at 9-10.  Whereas Osports' ownership claim is based on its purported work-

for-hire contracts, Action Sports claims ownership of certain photographs belonging to Stephen

Arce, Walter Arce, Ashley Dickerson, Michael DiNovo, Jerome Hamilton, Stephen Houchen,

Crystal Macleod, and John F. Moore "by virtue of employment relationships with [these] eight

photographers." Dkt. 130 at 10.  Plaintiffs note correctly that under section 201(b) of the

Copyright Act, 17 U.S.C. § 201(b), ownership of a work for hire "vests in the author's

employer," *id.* at 9-10, but they fail to establish that Action Sports is the employer of any of the

eight photographers, and the record evidence suggests otherwise.  Specifically, the agreements

Plaintiffs produced in discovery indicate that Stephen Arce, Dickerson, Macleod, and DiNovo

are independent contractors, not employees of Action Sports.  *See* Bloom Opp. Decl. Exs. B, C,

D & E (each referring to the "contracted photographers" and setting a "rate per race" fee);

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989) (holding that to

determine if a work is for hire as defined in section 101 of the Copyright Act, court first must

ascertain if it was prepared by an employee or by an independent contractor).  Moreover,

Plaintiffs did not produce any agreements for Walter Arce, Hamilton, Houchen, or Moore.[13]

Thus, Action Sports has failed to establish copyright ownership of the 7,450 photographs

attributed to these eight photographers.

*     *     *

The Court previously stated that Zuma would have to show, for each work at issue, either

ownership or a "specific license agreement appointing Zuma as exclusive licensee."  Dkt. 60.  By

---

[13] The copyright registrations for Action Sports do not constitute prima facie evidence of the validity of the copyrights because the registrations were made more than five years after first publication of the photographs.  *See* 17 U.S.C. § 410(c); *Int'l Media Films, Inc.*, 703 F. Supp. 2d at 463, 465 (granting summary judgment dismissing infringement claims as to film registered more than five years after first publication on ground that plaintiff failed to prove copyright ownership).  Thus, Action Sports' copyright registrations are not entitled to a presumption of validity, and even if they were, the presumption is rebutted by the evidence that the Action Sports photographers are not employees.  *See, e.g.*, *Chic Home Design LLC v. New Journey Grp., Ltd.*, No. 1:15-cv-09468 (JPO), 2017 WL 3738775, at *5 (S.D.N.Y. Aug. 30, 2017).

Getty Images' calculation, Plaintiffs have failed to prove ownership of 22,048 of the photographs.  Accordingly, Plaintiffs' motion for partial summary judgment must be denied (and Getty Images' motion for summary judgment should be granted) as to these works.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment should be denied.

Dated:  New York, New York                   Respectfully submitted,
         July 20, 2018


                                             By: /s/ Benjamin E. Marks
                                                  Benjamin E. Marks
                                                  Jonathan Bloom

                                             WEIL, GOTSHAL & MANGES LLP
                                             767 Fifth Avenue
                                             New York, New York  10153
                                             Tel:  (212) 310-8000
                                             Fax:  (212) 310-8007

                                             *Attorneys for Defendant Getty Images (US), Inc.*